**FILED**

Sep 29 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE

ROB BONTA
Attorney General of California
EMILIO VARANINI
Supervising Deputy Attorney General
JUSTIN J. LOWE
Deputy Attorney General
State Bar No. 223847
DAVID HOUSKA
Deputy Attorney General
State Bar No. 295918

455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
Telephone:  (415) 510-3837
Fax:  (415) 703-5480
E-mail:  Justin.Lowe@doj.ca.gov
*Attorneys for Plaintiff*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **STATE OF CALIFORNIA,** | Case No.  21-cv-07331 NC |
| PLAINTIFF, | **FINAL CONSENT JUDGMENT** |
| v. | |
| **PROVIDENCE GROUP, INC., a California Corporation, SUITABLE ACQUISITION COMPANY, LLC, a Delaware Limited Liability Company and a direct wholly-owned subsidiary of Providence Group, Inc., BAY BRIDGE CAPITAL PARTNERS, LLC, a Delaware Limited Liability Company, GI PLUM FUND B BLOCKER LLC, a Delaware Limited Liability Company, GI PLUM FUND B AIV LP, a Delaware Limited Partnership, GI GP IV L.P., a Delaware Limited Partnership, GI PLUM HOLDINGS LLC, a Delaware Limited Liability Company, NEW SISU HOLDCO, LLC, a Delaware Limited Liability Company, and GI PARTNERS ACQUISITIONS LLC,** | |
| DEFENDANTS. | |

1   WHEREAS, Plaintiff State of California ("California") filed its Complaint on September

2   20, 2021 (the "Complaint");

3   AND WHEREAS, California and Defendants Bay Bridge Capital Partners LLC, GI Plum

4   Fund B Blocker LLC, GI Plum Fund B AIV LP, GI GP IV L.P., GI Plum Holdings LLC, New

5   Sisu Holdco LLC, GI Partners Acquisitions LLC, (in this Final Judgment, "Plum" shall mean

6   these entities collectively, along with their parents, subsidiaries, successors, assigns, divisions,

7   groups, affiliates, officers, directors, employees, agents, and partners), Providence Group, Inc.,

8   and Suitable Acquisition Company LLC (in this Final Judgment, "Providence" shall mean

9   Providence Group, Inc. and Suitable Acquisition Company LLC collectively, along with their

10   parents, subsidiaries, successors, assigns, divisions, groups, affiliates, officers, directors,

11   employees, agents, and partners and, subsequent to the closing, "Providence" shall include the

12   Plum entities that Providence is acquiring in the proposed merger) (Plum and Providence

13   together, the "Defendants") have consented to the entry of this Final Judgment without trial or

14   adjudication of any issue of fact or law and without this Final Judgment constituting any evidence

15   against or admission by any party regarding any issue of fact or law;

16   AND WHEREAS, Providence and Plum agree to be bound by the provisions of this Final

17   Judgment pending its approval by the Court;

18   AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture

19   of certain rights and assets by Providence to ensure that the proposed merger between Providence

20   and Plum does not substantially reduce competition, as alleged by California in the Complaint;

21   AND WHEREAS, Providence and Plum have represented to California that the divestiture

22   required below can and will be made and that Providence and Plum will not raise claims of

23   hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions

24   contained below;

25   AND WHEREAS, California, Providence and Plum negotiated this Consent Judgment in

26   good faith in order to avoid litigation, and believe its terms to be fair, reasonable, and in the

27   public interest

28

1

1    AND WHEREAS, Providence and Plum have waived service of the Summons and

2    Complaint;

3    AND WHEREAS, all of the signatories below have the power and authority to bind the

4    entities they represent;

5    NOW THEREFORE, without trial or adjudication of any issue of fact or law, and upon

6    consent of the parties, it is ORDERED, ADJUDGED, and DECREED:

7    **I.    JURISDICTION**

8    The Court has jurisdiction over the subject matter of and each of the parties to this action.

9    The Complaint states a claim upon which relief may be granted against Providence and Plum

10    under Section 7 of the Clayton Act, 15 U.S.C. § 18 and the California Unfair Competition Act,

11    Cal. Bus. & Prof. Code § 17200 et seq.  The Attorney General for California, Rob Bonta, has

12    authority to bring this action on behalf of California in its sovereign capacity pursuant to Section

13    16 of the Clayton Act, 15 U.S.C. § 26, and California Bus. & Prof. Code § 17204.

14    **II.    DEFINITIONS**

15    A.    "Rocky Point Care Center" means the skilled nursing facility known by that name

16    located at 625 16th St. Lakeport, CA 95453.  This definition includes the company known as 625

17    16th St., LLC (which currently owns the property rights to the building located at that address),

18    the company known as Windflower Holdings, LLC (which currently operates the facility),

19    including any officers, directors, employees, agents, subsidiaries, divisions, or groups of those

20    two corporations.  "Rocky Point Care Center" also includes all other rights, titles, contracts,

21    assets, and interests of any kind held by 625 16th St., LLC and Windflower Holdings, LLC at the

22    time the Complaint was filed.

23    B.    "Divesture Purchasers" means NAHS North, Inc., a Nevada corporation, and

24    SENSEN LLC, a Nevada limited liability company, and their respective parents, subsidiaries,

25    successors, assigns, divisions, groups, affiliates, officers, directors, employees, agents, and

26    partners.

27

28

2

C.     "Defendants" shall mean Providence and Plum together, and their parents, subsidiaries, successors, assigns, divisions, groups, affiliates, officers, directors, employees, agents, and partners.

D.     The "Divestiture" shall mean the sale of Rocky Point Care Center by the Defendants to the Divesture Purchasers as detailed in the form of agreement attached to this Final Judgment as sealed Exhibit A.

## III.   APPLICABILITY

This Final Judgment applies to each Defendant and all other persons in active concert or participation with any Defendant who receive actual notice of this Final Judgment by personal service or otherwise.

## IV.   DIVESTITURE

A.     Defendants may close and complete the proposed merger described in the Complaint at any time following the entry of this Final Judgment.  At any time following the entry of this Final Judgement, but in any event no later than five (5) calendar days following the closing and completion of the proposed merger between Defendants, as described in the Complaint, Defendants must completely and fully divest Rocky Point Care Center to the Divesture Purchasers pursuant to the form of agreement attached to this Final Judgment as Exhibit A.  The attached form of agreement contemplates a divestiture by the Divestiture Sellers to the Divestiture Purchasers and shall not be modified except as to the pricing terms, financial schedules and other omitted schedules that shall be completed with the then current information at the time of the divestiture following this Court's approval.  Defendants represent and warrant that the final purchase agreement, including the pricing terms, financial schedules and other omitted schedules, shall be the result of arms-length negotiations between the Divestiture Sellers and Divestiture Purchasers, shall be reasonably related to the prevailing market value of Rocky Point Care Center, and shall be subject to approval by the Office of the California Attorney General.

1       B.    Defendants must obtain all regulatory approvals, to the extent any such approvals are

2  necessary, relating to the Divestiture as expeditiously as possible.

3       C.    At the option of the Divesture Purchasers, Providence shall provide the Divesture

4  Purchasers with transition assistance sufficient to efficiently transfer the Rocky Point Care

5  Center.  Such transition assistance shall be (1) provided as set forth in the form of agreement

6  attached to this Final Judgment as sealed Exhibit A (and specifically, as laid out in Schedule 3.2,

7  the "Form of OTA"); and (2) for a period sufficient to meet the requirements of this Final

8  Judgment, which shall be the later of (i) up to one year after the Divestiture date or (ii) the date

9  the Divesture Purchasers have obtained all required regulatory approvals, including Medicare and

10  Medicaid billing numbers for the Rocky Point Care Center.  *Provided however*, that if the

11  Divesture Purchasers terminate any transition assistance at an earlier date, Providence shall no

12  longer be obligated to provide such transition assistance.

13       D.    Defendants may not take any action that will impede in any way the permitting,

14  operation, or sale of Rocky Point Care Center, either before or after the Divestiture closes.

15  Examples of such actions that might impede the operation of Rocky Point Care Center include,

16  but are not limited to, removing equipment or other physical capital from Rocky Point Care

17  Center, transferring title to equipment or other physical capital away from Rocky Point Care

18  Center, cancelling or re-negotiating Rocky Point Care Center's contracts outside of the usual

19  course of business, failing to make reasonable efforts to collect on amounts owed to Rocky Point

20  Care Center, or any other action inconsistent with the long term operation of Rocky Point Care

21  Center as a going concern.  This paragraph shall not however apply to any removal, transfer,

22  renegotiation, or any other action which Defendants take at the express request of the Divesture

23  Purchasers.

24       E.    Until the Rocky Point Care Center has been divested, Defendants shall comply with

25  all applicable federal, state, and local laws, ordinances, and regulations with respect to the Rocky

26  Point Care Center, including those pertaining to the required staffing levels for a skilled nursing

27  facility (as defined by Cal. Code Regs., tit. 22, § 72103).

28

F.      For a period of twelve (12) months following the Divestiture or sale of Rocky Point Care Center pursuant to Section V below, Providence may not solicit or otherwise entice any employee of Rocky Point Care Center from leaving their employment.  Defendants acknowledge and agree that this provision is a reasonable and proportionate measure to protect the Divesture Purchasers' ability to operate Rocky Point Care Center following the Divestiture, especially in light of (1) the minimum length of time which the Divesture Purchasers estimate it shall need to ensure the successful transition of ownership and realize the full economic viability, marketability, competitiveness and value of Rocky Point Care Center; and (2) the highly localized geographic market for healthcare workers in Lake County that may interfere with the Divesture Purchasers' efforts to achieve optimal staffing levels at the facility.  Notwithstanding the foregoing, this provision does not prohibit Defendants from (1) hiring any employee of Rocky Point Care Center, provided that the hiring process is wholly initiated by the employee rather than by Defendants or in response to any solicitation by Defendants; or (2) making general advertisements for employment that are not tailored, targeted, or otherwise meant to attract employees of Rocky Point Care Center.

## V.    APPOINTMENT OF DIVESTITURE TRUSTEE

A.      If Defendants have not completed the Divestiture within the time period specified in Section IV.A., Defendants must immediately notify California of that fact in writing.  On California's application, the Court will appoint a Divestiture Trustee selected by California and approved by the Court to effect the sale of Rocky Point Care Center to a third party.

B.      After the appointment of a Divestiture Trustee becomes effective, only the Divestiture Trustee has the right to sell Rocky Point Care Center.  The Divestiture Trustee will have the power and authority to sell Rocky Point Care Center to an acquirer acceptable to California, in its sole discretion, on whatever terms are then obtainable upon reasonable effort by the Divestiture Trustee, subject to Sections IV and V of this Final Judgment.  The Divestiture Trustee will have any other powers that the Court deems appropriate.  The Divestiture Trustee may hire at the cost and expense of Providence any agents, investment bankers, attorneys, accountants, or consultants,

1    who will be solely accountable to the Divestiture Trustee, as reasonably necessary in the

2    Divestiture Trustee's judgment to assist in selling Rocky Point Care Center.  Any such agents or

3    consultants will serve on such terms and conditions as California approves, including

4    confidentiality requirements and conflict of interest certifications.  The Divestiture Trustee shall

5    provide to Defendants ten (10) calendar days' notice of any proposed sale prior to the execution

6    of any such sale agreement.

7          C.     Defendants shall not object to a sale by the Divestiture Trustee on any ground other

8    than the Divestiture Trustee's malfeasance.  Any such objection by Defendants must be conveyed

9    in writing to California and the Divestiture Trustee within ten (10) calendar days after the

10   Divestiture Trustee has provided the notice required under Section V(B).

11         D.     The Divestiture Trustee will serve at the cost and expense of Providence under a

12   written agreement, on such terms and conditions as California approves, including confidentiality

13   requirements and conflict of interest certifications.  The Divestiture Trustee will account for all

14   monies derived from the sale of the assets sold by the Divestiture Trustee and all costs and

15   expenses so incurred.  After approval by the Court of the Divestiture Trustee's accounting,

16   including fees for any of its services yet unpaid and those of any professionals and agents retained

17   by the Divestiture Trustee, all remaining money will be paid to Providence and

18   the trust will then be terminated.  The compensation of the Divestiture Trustee and any

19   professionals and agents retained by the Divestiture Trustee will be reasonable in light of the

20   value of the Divestiture Assets and based on a fee arrangement that provides the Divestiture

21   Trustee with incentives based on the price and terms of the divestiture and the speed with which it

22   is accomplished, but the timeliness of the divestiture is paramount.  If the Divestiture Trustee and

23   Providence are unable to reach agreement on the Divestiture Trustee's or any agents' or

24   consultants' compensation or other terms and conditions of engagement within fourteen (14)

25   calendar days of the appointment of the Divestiture Trustee, California may, in its sole discretion,

26   take appropriate action, including making a recommendation to the Court.  The Divestiture

27   Trustee will, within three business days of hiring any other agents or consultants, provide written

28   notice of such hiring and the rate of compensation to Providence and California.

6

STIPULATED AND FINAL JUDGMENT – State of California v. Providence Group, Inc., et al.

E.      Providence must use its best efforts to assist the Divestiture Trustee in accomplishing the sale of Rocky Point Care Center, including by informing the Divestiture Trustee of all information related to any prior or future: (1) attempts to sell Rocky Point Care Center, (2) outreach or attempts to generate interest by possible buyers of Rocky Point Care Center after the appointment of the Divestiture Trustee, and (3) inquiries or expressions of interest by potential buyers of which Providence becomes aware at any time.  The Divestiture Trustee and any agents or consultants retained by the Divestiture Trustee will have full and complete access to the personnel, books, records, and facilities of Rocky Point Care Center, and Providence must provide or develop financial and other information relevant to such business as the Divestiture Trustee may reasonably request, subject to reasonable protection for trade secrets; other confidential research, development, or commercial information; or any applicable privileges. Defendants may not take any action to interfere with or to impede the Divestiture Trustee's accomplishment of the sale of Rocky Point Care Center.

F.      After its appointment, the Divestiture Trustee will file monthly reports with California and, as appropriate, the Court, setting forth the Divestiture Trustee's efforts to accomplish the divestiture ordered under this Final Judgment.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports will not be filed in the public docket of the Court.  Such reports will include the name, address, and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring any interest in Rocky Point Care Center and will describe in detail each contact with any such person.  The Divestiture Trustee will maintain full records of all efforts made to sell Rocky Point Care Center.

G.      If the Divestiture Trustee has not successfully sold Rocky Point Care Center, as ordered under this Final Judgment, within six months after its appointment, the Divestiture Trustee will promptly file with the Court a report setting forth (1) the Divestiture Trustee's efforts to accomplish sale of Rocky Point Care Center; (2) the reasons, in the Divestiture Trustee's judgment, why the sale has not been accomplished; and (3) the Divestiture Trustee's

7

recommendations.  To the extent such reports contain information that the Divestiture Trustee deems confidential, such reports will not be filed in the public docket of the Court.  The Divestiture Trustee will at the same time furnish such report to California, which will have the right to make additional recommendations consistent with the purpose of the trust.  The Court thereafter will enter such orders as it deems appropriate to carry out the purpose of the Final Judgment, which may, if necessary, include extending the trust and the term of the Divestiture Trustee's appointment by a period requested by California.

H.     If California determines that the Divestiture Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, California may recommend the Court appoint a substitute Divestiture Trustee.

## VI.   ASSET PRESERVATION

Until the Divestiture has been accomplished, Defendants must take all steps necessary to preserve the full economic viability, marketability, competitiveness and value of Rocky Point Care Center and its ability to successfully compete following the completion of the Divestiture. Defendants may not take any action that would jeopardize the Divestiture ordered by the Court.

## VII.  AFFIDAVITS

A.     Within twenty (20) calendar days of the filing of the Complaint in this matter, and every thirty (30) calendar days thereafter until the Divestiture has been completed under Section IV or Rocky Point Care Center has been sold pursuant to Section V, Providence must deliver to California an affidavit, signed by each Providence's chief financial officer and general counsel, which describes the fact and manner of Providence's compliance with this Final Judgment.  If the Divestiture has not been completed under Section IV,  each affidavit must include:  1) the name, address, and telephone number of each person who, during the preceding thirty (30) calendar days, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the Divestiture

8

Assets, and must describe in detail each contact with any such person during that period; and 2) a description of Providence's efforts to solicit buyers for Rocky Point Care Center, and to provide required information to prospective acquirers, including the limitations, if any, on such information. Assuming the information set forth in the affidavit is true and complete, any objection by California to information provided by Defendants, including limitation on information, must be made within 14 calendar days of receipt of such affidavit.

B.     Within twenty (20) calendar days of the filing of the Complaint in this matter, Defendants must deliver to California an affidavit that describes in reasonable detail all actions Defendants have taken and all steps Defendants have implemented on an ongoing basis to comply with Section VI of this Final Judgment.  Defendants must deliver to California an affidavit describing any changes to the efforts and actions outlined in Defendants' earlier affidavits filed under this Section within fifteen (15) calendar days after the change is implemented.

C.     Defendants must keep all records of all efforts made to preserve and divest Rocky Point Care Center until one year after the Divestiture has been completed or Rocky Point Care Center has been sold under Section V.


## VIII. APPOINTMENT OF MONITORING TRUSTEE

A.     Affiliated Monitors, Inc., P.O. Box 961791, Boston, MA. 02196, shall serve as Monitoring Trustee.

B.     The Monitoring Trustee will have the power and authority to monitor Defendants' compliance with the terms of this Final Judgment and will have any other powers that the Court deems appropriate.  The Monitoring Trustee must investigate and report on the Defendants' compliance with this Final Judgment and on Defendants' progress toward effectuating the purposes of this Final Judgment, including the implementation and execution of the Divestiture.

C.     The Monitoring Trustee may hire at the cost and expense of Providence any agents, investment bankers, attorneys, accountants, or consultants, who will be solely accountable to the Monitoring Trustee, reasonably necessary in the Monitoring Trustee's judgment.  These agents, investment bankers, attorneys, accountants, or consultants will serve on terms and conditions

9

approved by California, including confidentiality requirements and conflict-of-interest certifications.

D.    Defendants may not object to actions taken by the Monitoring Trustee in fulfillment of the Monitoring Trustee's responsibilities on any ground other than the Monitoring Trustee's malfeasance.  Any such objection by Defendants must be conveyed in writing to California and the Monitoring Trustee within ten (10) calendar days after the action taken by the Monitoring Trustee giving rise to Defendants' objection.

E.    The Monitoring Trustee will serve at the cost and expense of Providence, under a written agreement with Providence and on such terms and conditions as California approves, including confidentiality requirements and conflict of interest certifications.  The compensation of the Monitoring Trustee and any agents or consultants retained by the Monitoring Trustee will be on reasonable and customary terms commensurate with the Monitoring Trustee's experience and responsibilities.  If the Monitoring Trustee and Defendants are unable to reach agreement on the Monitoring Trustee's or any agents' or consultants' compensation or other terms and conditions of engagement within fourteen calendar days of the entry of this Final Judgment, California may, in its sole discretion, take appropriate action, including making a recommendation to the Court.  The Monitoring Trustee will, within three (3) business days of hiring any agents or consultants, provide written notice of such hiring and the rate of compensation to Defendants and California.

F.    The Monitoring Trustee will have no responsibility or obligation for the operation of Defendants' businesses.

G.    Defendants will use their best efforts to assist the Monitoring Trustee in monitoring Defendants' compliance with their individual obligations under this Final Judgment.  The Monitoring Trustee and any agents or consultants retained by the Monitoring Trustee will have full and complete access to the personnel, books, records, and facilities relating to compliance with this Final Judgment, subject to reasonable protection for trade secrets; other confidential research, development, or commercial information; or any applicable privileges.  Defendants may not take any action to interfere with or to impede the Monitoring Trustee's accomplishment of its responsibilities.

H.     The Monitoring Trustee will file a report within fourteen (14) calendar days following the completion of the Divestiture, setting forth Defendants' efforts to comply with this Final Judgment.  To this extent this report contains information that the Monitoring Trustee deems confidential, the report may not be filed in the public docket of the Court.  If the Divesture is not accomplished pursuant to Section IV of this Final Judgment, the Monitoring Trustee will report such in its report.   Every thirty (30) calendar days thereafter, the Monitoring Trustee will file a further report setting forth Defendants' ongoing efforts to comply with this Final Judgment, including but not limited to their provision of transition services assistance to the Divesture Purchasers.

I.     If California determines that the Monitoring Trustee has ceased to act or failed to act diligently or in a reasonably cost-effective manner, it may recommend the Court appoint a substitute Monitoring Trustee.

J.     The Monitoring Trustee's obligations shall terminate once (1) all transition services assistance, as provided by the form of agreement attached hereto as Exhibit A are complete; and (2) the Divesture Purchasers have received all necessary regulatory approvals and/or permits to operate Rocky Point Care Center.


## IX.   COMPLIANCE INSPECTION

A.     For the purposes of determining or securing compliance with this Final Judgment, or of determining whether the Final Judgment should be modified or vacated, and subject to any legally recognized privilege, from time-to-time authorized representatives of California, including agents and consultants retained by California, must, upon written request and on reasonable notice to Defendants, be permitted:

(1) access during Defendants' office hours to inspect and copy or, at the option of the California, to require Defendants to provide electronic copies of all books, ledgers, accounts, records, data, and documents in the possession, custody, or control of Defendants relating to any matters contained in this Final Judgment; and

STIPULATED AND FINAL JUDGMENT – State of California v. Providence Group, Inc., et al.

(2) to interview, either informally or on the record, Defendants' officers, employees, or agents, who may have their individual counsel present, regarding such matters. The interviews are subject to the reasonable convenience of the interviewee and without restraint or interference by Defendants.

B.     Upon the written request, Defendants must submit written reports or responses to written interrogatories, under oath if requested, relating to any of the matters contained in this Final Judgment as may be requested.

C.     No information or documents obtained by the means provided in this Section may be divulged by California to any person other than an authorized representative of the California Attorney General's Office, except in the course of legal proceedings to which California is a party (including grand jury proceedings), for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

## X.     NO REACQUISITION OR RECOMBINATION OF ROCKY POINT CARE CENTER

Providence may not reacquire any part of Rocky Point Care Center for ten (10) years following the entry of this Final Judgment, except with the prior approval of the California Attorney General's Office.  If, following the expiration of this term, Providence does seek to reacquire any part of Rocky Point Care Center, this Final Judgment shall not waive or otherwise affect the enforcement of state or federal antitrust law, including the Cartwright and Clayton Acts, and the Unfair Competition Law, against such an acquisition.

## XI.     NOTICE OF FUTURE ACQUISITIONS

For a period of ten (10) years following the entry of this Final Judgment, Providence must notify California of any merger, acquisition, or other transaction it participates in that both (1) involves any skilled nursing facility in California, and (2) for which it must notify the federal Department of Justice Antitrust Division and Federal Trade Commission under the Hart-Scott-Rodino Antitrust Improvements Act (15 U.S.C. §§ 18a *et. seq.*).  For purposes of this section, a

skilled nursing facility constitutes a facility covered by Cal. Code Regs., tit. 22, § 72103.  For

purposes of this section shall include, but will not be limited to, transactions that (1) involve a

change in the ownership of the person or entity which holds the property rights for a building in

which a skilled nursing facility operates; or (2) involve a change in the ownership of a company

which manages the operations of a skilled nursing facility.  Providence may comply with this

section by providing California with the same notice that it provides the federal Department of

Justice Antitrust Division and Federal Trade Commission under the Hart-Scott-Rodino Antitrust

Improvements Act, at the same time that it provides such notice to the federal authorities.

## XII.   TERM

Unless extended by the Court (either on its own accord or after application by California),

this Final Judgment shall expire ten (10) years after its entry.

## XIII. NOTICE

Any notices required under this Final Judgment shall be sent via U.S. Mail and electronic

mail to:

**For Plaintiff:**
Emilio Varanini
Supervising Deputy Attorney General
Justin J. Lowe
David Houska
Deputy Attorneys General
California Department of Justice
Healthcare Rights and Access Section
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Emilio.varanini@doj.ca.gov
Justin.lowe@doj.ca.gov
David.houska@doj.ca.gov

**For Defendants:**
John Mitchell
Vice President, General Counsel
Providence Administrative Consulting Services, Inc.
140 N Union Ave, Suite 320
Farmington UT 84025
john.mitchell@pacshc.com

Attn:  Brian Byrne and Kenneth S. Reinker
Cleary Gottlieb Steen & Hamilton LLP
2112 Pennsylvania Avenue, NW
Washington, DC 20037
bbyrne@cgsh.com
kreinker@cgsh.com
David Smolen
GI Partners
188 The Embarcadero Suite 700
San Francisco, CA 94105
David.smolen@gipartners.com

Attn: Marin Boney and Stephanie Greco
Kirkland & Ellis LLP
1301 Pennsylvania Ave. NW
Washington DC 20004
stephanie.greco@kirkland.com
marin.boney@kirkland.com


**For the Monitoring Trustee:**
Bethany Hengsbach
Managing Director, Global Corporate Compliance
Jesse Caplan
Managing Director, Corporate Oversight
Affiliated Monitors, Inc.
P.O. Box 961791
Boston, MA  02196
bhengsbach@affiliatedmonitors.com


## XIV. Retention of Jurisdiction

The Court retains jurisdiction to enable any party to this Final Judgment to apply to the

Court at any time for further orders and directions as may be necessary or appropriate to carry out

or construe this Final Judgment, to modify any of its provisions, to enforce compliance, and to

punish violations of its provisions.


## XV. Enforcement of Final Judgment

A.      California retains and reserves all rights to enforce the provisions of this Final

Judgment, including the right to seek an order of contempt from the Court.  Defendants agree that

in any civil contempt action, any motion to show cause, or any similar action brought by

California regarding an alleged violation of this Final Judgment, California may establish a

14

1  violation of the decree and the appropriateness of any remedy therefor by a preponderance of the

2  evidence, and Defendants waive any argument that a different standard of proof should apply.

3      B.      The Final Judgment should be interpreted to give full effect-to the procompetitive

4  purposes of state and federal antitrust laws, including the Cartwright and Clayton Acts, and to

5  restore all competition harmed by the challenged conduct.  Defendants agree that they may be

6  held in contempt of, and that the Court may enforce, any provision of this Final Judgment that, as

7  interpreted by the Court in light of these procompetitive principles and applying ordinary tools of

8  interpretation, is stated specifically and in reasonable detail, whether or not it is clear and

9  unambiguous on its face. In any such interpretation, the terms of this Final Judgment should not

10  be construed against either party as the drafter.

11      C.      California has entered into this Final Judgment in reliance on the representations of

12  the Defendants and their counsel regarding the matters set forth in the Complaint and this Final

13  Judgment.  Defendants represent that neither they nor their counsel have made any

14  representations to California relating to the subject matter of this Final Judgment and Complaint

15  that are materially inaccurate, false or misleading.  If California subsequently discovers that any

16  representations by Defendants or their counsel are materially inaccurate, false or misleading, or

17  that Defendants or their counsel have failed to disclose any material fact relevant to the subject

18  matter of this Final Judgment and Complaint, California reserves any and all rights to seek

19  appropriate relief from the Court, including a modification or rescission of this Final Judgment.

20

21  **XVI.  PUBLIC INTEREST DETERMINATION**

22      The Court finds that entry of this Final Judgment is in the public interest.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

15

1   APPROVED AS TO FORM:

2

3
    Dated: September 20, 2021
4

5

    *Brian Byrne (SBN 181362)*
6   Cleary Gottlieb Steen & Hamilton LLP
    2112 Pennsylvania Ave., NW
7   Washington, DC 20037
    (202) 974-1500 (Phone)
8   (202) 974-1999 (Facsimile)
    bbyrne@cgsh.com
9   *Attorneys for Providence Group, Inc.*

10

11
    Dated: September 20, 2021
12

13

14   Rachael A. Rezabek (SBN 298711)
     Kirkland & Ellis LLP
15   1601 Elm Street
     Dallas, TX 75201
16   United States
     rachael.rezabek@kirkland.com
17   *Attorneys for Bay Bridge Capital Partners*
     *LLC, GI Plum Fund B Blocker LLC, GI*
18   *Plum Fund B AIV LP, GI GP IV L.P., GI*
     *Plum Holdings LLC, New Sisu Holdco LLC,*
19   *and GI Partners Acquisitions LLC*

20

21

22

23

24

25

26

27

28
                                    16

1   APPROVED AS TO FORM:

2

3
    Dated:  September __, 2021
4

5
                                        _____
6                                       Brian Byrne (SBN 181362)
                                        Cleary Gottlieb Steen & Hamilton LLP
7                                       2112 Pennsylvania Ave., NW
                                        Washington, DC 20037
8                                       (202) 974-1500 (Phone)
                                        (202) 974-1999 (Facsimile)
9                                       bbyrne@cgsh.com
                                        *Attorneys for Providence Group, Inc.*
10

11
    Dated:  September 20, 2021
12

13                                      _____
14                                      Rachael A. Rezabek (SBN 298711)
                                        Kirkland & Ellis LLP
15                                      1601 Elm Street
                                        Dallas, TX 75201
16                                      United States
                                        rachael.rezabek@kirkland.com
17                                      *Attorneys for Bay Bridge Capital Partners*
                                        *LLC, GI Plum Fund B Blocker LLC, GI*
18                                      *Plum Fund B AIV LP, GI GP IV L.P., GI*
                                        *Plum Holdings LLC, New Sisu Holdco LLC,*
19                                      *and GI Partners Acquisitions LLC*

20

21

22

23

24

25

26

27

28
                                        16

1    **SIGNATURES OF THE PARTIES:**

2

3    Dated: September 20, 2021                    ROB BONTA
                                                  Attorney General of California
                                                  EMILIO VARANINI
4                                                 Supervising Deputy Attorney General

5

6                                                 _____
                                                  JUSTIN J. LOWE
                                                  David Houska
7                                                 Deputy Attorneys General
                                                  *Attorneys for Plaintiff*
8

9

10   Dated: September ___, 2021

11

12                                                _____
                                                  Derick Apt
13
                                                  Assistant Treasurer
                                                  Providence Group, Inc.
14
                                                  Assistant Treasurer
15                                                Suitable Acquisition Company, LLC

16

17

18

19   Dated: September ___, 2021

20

21                                                _____
                                                  Paul Hubbard
22
                                                  Manager
                                                  Bay Bridge Capital Partners LLC
23
                                                  Authorized Signature
24                                                New Sisu Holdco, LLC

25

26

27

28
                                        17

# SIGNATURES OF THE PARTIES:

Dated: September 20, 2021

ROB BONTA
Attorney General of California
EMILIO VARANINI
Supervising Deputy Attorney General

_____

JUSTIN J. LOWE
David Houska
Deputy Attorneys General
*Attorneys for Plaintiff*

Dated: September __20__, 2021

_____

Derick Apt

Assistant Treasurer
Providence Group, Inc.

Assistant Treasurer
Suitable Acquisition Company, LLC

Dated: September __20__, 2021

_____

Paul Hubbard

Manager
Bay Bridge Capital Partners LLC

Authorized Signature
New Sisu Holdco, LLC

17

1 | Dated:  September 20 2021

2

3 | David Smolen

4 | General Counsel
  | GI Plum Fund B Blocker LLC
5
  | General Counsel
6 | GI Plum Fund B AIV LP

7 | General Counsel
  | GI Plum Holdings LLC
8
  | General Counsel
9 | GI GP IV L.P.

10 | General Counsel
   | GI Partners Acquisitions LLC
11

12

13

14 | **FILER'S ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1**

15 | Pursuant to Civil Local Rule 5-1(i)(3), I, Justin Lowe, attest that concurrence in the filing

16 | of this document has been obtained from all other signatories.  Executed on September 20, 2021

17 | in Menlo Park, California.

18 | /s/ Justin Lowe

19 | **IT IS SO ORDERED.**

20

21 | Dated:  September 29 2021

22 | UNITED STATES DISTRICT JUDGE

GRANTED

Judge Nathanael M. Cousins

28

18

**EXHIBIT A**

**FORM OF PURCHASE AGREEMENT**

**MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT**

**BY AND AMONG**

**625 16th STREET, LLC, a California limited liability company ("625")**

**WINDFLOWER HOLDINGS, LLC, a California limited liability company ("Windflower")**

**CALIFORNIA OPCO, LLC, a, California limited liability company, ("Cal")**

**BAY BRIDGE CAPITAL PARTNERS, LLC, a Delaware limited liability company ("Bay Bridge")**

**[Cal and Bay Bridge are the "Sellers"]**

**AND,**

**SENSEN LLC, a Nevada limited liability company ("Sensen")**

**NAHS NORTH, INC., a Nevada corporation ("NAHS North")**

**["Buyer"]**

**DATED [_____], 2021**

**MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT**

**THIS MEMBERSHIP INTEREST PURCHASE AND SALE AGREEMENT** (this "**Agreement**") is made and entered into as of [_____ ___], 2021 (the "**Effective Date**"), by and among: (i) NAHS North, Inc., a Nevada corporation ("**NAHS North**"); (ii) SENSEN LLC, a Nevada limited liability company ("**Sensen**", and collectively with NAHS North, the "**Buyer**"); (iii) Windflower Holdings, LLC, a California limited liability company ("**Windflower**"); (iv) 625 16th Street, LLC, a California limited liability company ("**625**"; and, together with Windflower, the "**Acquired Company**" or alternatively the "**Acquired Companies**"); (v) California Opco, LLC, a California limited liability company ("**Cal**"); and (vi) Bay Bridge Capital Partners, LLC, a Delaware limited liability company ("**Bay Bridge**"; and collectively with Cal, the "**Seller**").   Buyer, Seller, and Acquired Company are referred to herein individually as a "**Party**" and collectively as the "**Parties**."

<u>Recitals</u>

A.      **WHEREAS**, Cal owns one hundred percent (100%) of the Equity Interests (as hereinafter defined) of Windflower;

B.      **WHEREAS**, Bay Bridge owns one hundred percent (100%) of the Equity Interests of 625;

C.      **WHEREAS**, 625 currently leases the skilled nursing facility commonly known as "Rocky Point Care Center" located at 625 16th Street, Lakeport, CA 95453 (the "**Facility**") to Windflower;

D.      **WHEREAS**, pursuant to that certain Unit and Purchase Agreement, dated as of February 25, 2021, by and among Providence Corporation Inc., a California Corporation ("**Providence**"), Suitable Acquisition Company, LLC, a Delaware limited liability company, and a direct wholly-owned subsidiary of Providence, Bay Bridge Capital Partners, LLC, a Delaware limited liability company (the parent entity to Seller and all of its affiliated entities, including, but not limited to 625 and Windflower), and certain other wholly owned subsidiaries thereof (the "**Merger Agreement**"), Providence holds a right to purchase the Acquired Company;

E.      **WHEREAS**, notwithstanding the foregoing, the Federal Trade Commission (the "**FTC**") requires as a condition to the closing of the Merger Agreement the sale of Acquired Company;

F.      **WHEREAS**, the Seller shall only acquire title as of the closing of the Merger Agreement, but shall cause all parties to proceed and act in good faith to carry out the intentions of this Agreement; and

G.      **WHEREAS**, the Seller now desires to sell, and Buyer desires to purchase the Acquired Interests (*i.e.*, with NAHS North acquiring the Acquired Interests of Windflower and Sensen acquiring the Acquired Interests of 625) for the Purchase Price (as defined below), on the terms and subject to the conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual representations, warranties and covenants and subject to the conditions herein contained, the parties hereto, intending to be legally bound hereby, agree as follows:

**AGREEMENT**

**Article 1**
**Definitions**

**Section 1.1**      <u>**Certain Defined Terms**</u>.  As used herein, the terms below shall have the

1

following meanings. Any of such terms, unless the context otherwise requires, may be used in the singular or plural, depending upon the reference.

"**Accounts Receivable**" means all accounts receivable of the Acquired Company or other rights to receive payment owing to the Acquired Company, including rights to receive payment for unbilled services or rent.

"**Affiliate**" means with respect to a specified Person, any other Person which directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with the Person specified and, with respect to any natural person, shall include all persons related to such person by blood or marriage,  and the term "control" means possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person whether through ownership of voting securities, by contract or otherwise.

"**Business Day**" means each day that is not a Saturday, Sunday or other day on which banking institutions located in Los Angeles, California are authorized or obligated by Law or executive order to close.

"**CARES Act**" means the Coronavirus Aid, Relief, and Economic Security Act, P.L. 116-136.

"**Cash Equivalents**" means all cash and cash equivalents of the Acquired Company (including marketable securities and short term investments) on hand or on deposit as of the applicable date (the amount of which shall be reduced by (a) all claims against such cash and cash equivalents represented by outstanding checks, drafts, wire transfers or similar instruments which have not been applied against such cash and cash equivalent balances and (b) all escrowed cash or other restricted cash balances).

"**Closing**" means the closing of the Contemplated Transactions.

"**Code**" means the Internal Revenue Code of 1986, as amended from time to time.

"**Company Employee**" means any current or former facility employee of the Acquired Company.

"**Contemplated Transactions**" means the transactions contemplated by this Agreement.

"**Contracts**" means, with respect to the Acquired Company, contracts, leases, agreements, purchase orders, commitments, legally binding obligations and understandings, in any case whether written or oral where Windflower or 625 are a direct party thereto.

"**Debt**" means, with respect to the Acquired Companies, all obligations (including all obligations in respect of principal, interest, penalties, fees and premiums): (i) for money borrowed (including overdraft facilities), whether or not evidenced by bonds, debentures, notes or other similar instruments (including any obligations under any letter of credit, banker's acceptance or related reimbursement agreement); (ii) under Contracts related to interest rate protection, swap agreements and collar agreements; (iii) in respect of the deferred purchase price of property, goods or services; (iv) under capital leases; (v) all obligations of the Acquired Company with respect to any change of control, severance, termination, bonuses or other similar amounts triggered (pursuant to any Contract or other obligation in effect on or prior to the Closing (and not created by Buyer)) in whole or in part by the Contemplated Transactions; (vi) all accounts payable and other liabilities (including accrued payroll and bonus obligations and expenses and accrued paid time off in excess of amounts permitted by Buyer's paid time off policies); (vii) all obligations of the Acquired Company related to litigation which has been settled; (viii) accrued franchise or city Taxes; (ix) liabilities

for accrued but unpaid income Taxes; (x) all Deferred Payroll Tax Liability; (xi) liabilities for Taxes related to a cash to accrual conversion for pre-Closing items, (xii) for any and all obligations of other Persons guaranteed by the Acquired Company of the types described in clauses (i) through (xi); and (xiii) for any accrued interest, prepayment or change of control premiums or penalties or other costs, fees or expenses related to any of the foregoing, including any unpaid portion of any existing renewal fees or termination fees, and all other amounts necessary to cause the release of all Liens on the collateral securing the obligations described in this definition and terminate all Contracts related thereto.

"**Deferred Payroll Tax Liability**" means payroll tax liability, the payment of which has been deferred by the Acquired Company under the authority of Section 2302 of the CARES Act.

"**Disclosure Schedule**" means the Disclosure Schedule delivered by Seller concurrently with the execution and delivery of this Agreement.

"**Environmental Laws**" means any legal requirement that relates to the generation, storage, handling, discharge, emission, transportation, treatment or disposal of Hazardous Materials or wastes or to the protection of human health, worker health and safety and the environment, including the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Resource Conservation and Recovery Act, the Clean Water Act, the Federal Water Pollution Control Act, the Safe Drinking Water Act, the Toxic Substances Control Act, the Occupational Safety and Health Act, and the Hazardous Material Transportation Act, in each case as amended, and the regulations implementing such acts and the state and local equivalent of such acts and regulations, and common law.

"**Equity Interests**" of Acquired Company means any (i) outstanding capital stock, membership or partnership or other ownership interest; (ii) securities directly or indirectly convertible into or exchangeable for any of the foregoing; (iii) options, warrants or other rights directly or indirectly to purchase or subscribe for any of the foregoing or securities convertible into or exchangeable for any of the foregoing; or (iv) contracts, commitments, agreements, understandings, arrangements, calls or claims of any kind relating to the issuance of any of the foregoing or giving any Person the right to participate in or receive any payment based on the profits or performance of Acquired Company (including any equity appreciation, phantom equity or similar plan or right).

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"**ERISA Affiliate**" means any Person that, together with the Acquired Company would be deemed to be a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code or any other company, entity or trade or business that has adopted or has ever participated in any Plan.

"**GAAP**" means generally accepted accounting principles as in effect in the United States of America.

"**Government Programs**" means any federal or state health programs as defined in 42 U.S.C. § 1320a-7b(f).

"**Governmental Entity**" means any nation, sovereign or government, any state or other political subdivision thereof, any branch of government, agency, department, authority or instrumentality thereof, including, without limitation, any and all federal, state or local governments, governmental institutions, public authorities and other governmental entities of any nature whatsoever, and any municipalities, instrumentalities or subdivisions thereof, and any Person or authority exercising executive, legislative,

taxing, judicial, regulatory or administrative functions of or pertaining to government, including any central bank, stock exchange, regulatory body, arbitrator, public sector entity, supra-national entity, any self-regulatory organization, any department, commission, board, bureau, agency, court, tribunal, judicial or arbitral body, administration and panel, and any divisions or instrumentalities thereof, whether permanent or ad hoc.  Governmental Entity shall also include any agency, branch or other governmental body charged with the responsibility and/or vested with the authority to administer and/or enforce Medicare or Medicaid including contractors, intermediaries or carriers, and any related agencies and bodies.

"**Hazardous Materials**" means (A) any petroleum or petroleum products or by-products, radioactive materials, asbestos in any form that is friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyl, and radon gas;  and (B) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "extremely hazardous wastes," "restricted hazardous wastes," "toxic substances," "toxic pollutants," "medical waste", "pollutant" or "contaminant" or words of similar import, under any Law.

"**Healthcare Laws**" means all material Laws relating to the regulation, provision or administration of, or payment for, healthcare products or services, including, but not limited to (a) any and all federal and state fraud and abuse Laws, including  the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7(b)), the Stark Law (42 U.S.C. § 1395nn and § 1395(q)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code, the False Statements Relating to Health Care Matters Law (18 U.S.C. § 1035), Health Care Fraud (18 U.S.C. § 1347), all state self-referral prohibitions, anti-kickback Laws, illegal remuneration and provider conflict of interest Laws, or any regulations promulgated pursuant to such statutes, or similar state or local statutes or regulations; (b) the federal Food, Drug & Cosmetic Act (21 U.S.C. §§ 301 et seq.) and other federal and state requirements concerning the distribution of Legend Drugs and Legend Devices; (c) Medicare (Title XVIII of the Social Security Act) and the conditions of participation and regulations promulgated thereunder; (d) Medicaid (Title XIX of the Social Security Act) and the regulations promulgated thereunder; (e) TRICARE (10 U.S.C. § 1071 et seq.) and the regulations promulgated thereunder (f) the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Pub. L. No. 108-173) and the regulations promulgated there under; (g) Privacy Laws; (h) all Laws relating to healthcare-related licensure, certification or registration requirements of all Governmental Entities applicable to the Acquired Company (i) quality, safety and accreditation requirements to the extent required by applicable state Laws or governmental regulatory bodies; and (j) statutory and regulatory requirements relating to the billing or submission of claims, collection of accounts receivable, underwriting the cost of, or provision of management or administrative services in connection with, Government Programs, by the Acquired Company, including Laws and regulations relating to professional fee splitting, certificates of need, and certificates of operations and authority.

"**HIPAA**" means, and as may from time-to time may be amended, the (i) Health Insurance Portability and Accountability Act of 1996 (the "Act"), including its Omnibus Rule; (ii) applicable provisions of the Health Information Technology for Economic and Clinical Health Act as incorporated in the American Recovery and Reinvestment Act of 2009; and (iii) their accompanying regulations, including the Privacy Rule and the Security Rule.

"**Knowledge**" or "**knowledge**" or "**aware**" and all permutations thereof – an individual will be deemed to have "Knowledge" of a particular fact or other matter if such individual is actually aware of such fact or matter.

"**Law**" means any and all federal, state and local statutes, rules, regulations, ordinances and any amendments thereto, applicable to the activities and conduct of the Acquired Company and their respective

employees and contractors, as well as each, any, and all legal directives, instructions, valid policies, orders and any amendments thereto, of all Federal, state, local and other Governmental Entity having jurisdiction over any or all of the activities and conduct of the Acquired Company, their respective employees and contractors, and "Law" or "Laws" includes all Healthcare Laws.

"**Liabilities**" means claims, liabilities, obligations or Debt of any nature, whether known or unknown, whether asserted or unasserted, whether determined, determinable or otherwise, whether absolute or contingent, whether direct or indirect, whether accrued or unaccrued, whether liquidated or unliquidated, whether incurred or consequential, whether due or to become due and whether or not required to be accrued on financial statements.

"**Liens**" means liens, mortgages, pledges, security interests, claims, assessments, judgements, encumbrances and charges of every kind.

"**Losses**" means any and all claims, demands, governmental orders, Liens, controversies, audits, suits, bonds, dues, assessments, penalties, Taxes, fees, charges, costs (including the costs of investigation, defense and enforcement of this Agreement), Debts, losses, lost profits, damages, fines, expenses, Liabilities, obligations, actions or causes of action of every nature and character, whether fixed, accrued or contingent, liquidated or unliquidated, matured or unmatured, direct, derivative or consequential, arising from contract, tort, statute, regulation or otherwise, penalties, charges, assessments, judgments, settlements, or other monetary obligations (including attorneys', experts and paralegal fees and other expenses and court costs at the administrative, trial and appellate levels).

"**Material Adverse Effect**" means, when used in connection with any Person that is not an individual, a change, effect, condition, circumstance or development that is materially adverse to the business, operations, assets, liabilities, financial condition, value, ability to deliver services, operating results, cash flow, or net worth of such Person, or otherwise materially adversely affecting the ability of such Person (if a party hereto) to consummate the Contemplated Transactions.

"**Medicare Advance Payments**" means advanced payments made by CMS pursuant to the CMS Accelerated and Advance Payment Program related to COVID-19.

"**Order**" means any award, decision, writ, injunction, judgment, order, ruling, subpoena or verdict entered, issued, made or rendered by any Governmental Entity or by any arbitrator.

"**Paycheck Protection Program**" means the "Paycheck Protection Program" under Section 7(a) of the Small Business Act (15 U.S.C. 636(a)), as amended by Sections 1102 and 1106 of the CARES Act, any current or future regulations or official interpretations thereof and any current or future guidance and rules published by the U.S. Small Business Administration related thereto.

"**Payor**"   means any third party that pays or reimburses the Acquired Company for the provision, or arranging for the provision, of health care or related services rendered or to be rendered to patients, and includes a health insurer, a health maintenance organization, any managed care organization, the Medicare program, the Medicaid program, and any federal or state Governmental Entity thereof that in any way administers, supervises or implements any Government Program or any contractor, administrator or agent thereof.

"**PBGC**" means the Pension Benefit Guaranty Corporation.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Entity, unincorporated organization, trust, association or other entity.

"**PHI**" means protected health information.

"**PPP Loan**" means any Debt of the Acquired Company received through the Paycheck Protection Program under the CARES Act by the Acquired Company.

"**Pre-Closing Tax Period**" means a Tax period of the Acquired Company that begins before and ends on or before the Closing Date, and the portion of such taxable period ending on and including the Closing Date.

"**Pre-Closing Taxes**" means (a) all Taxes (or the non-payment thereof) of the Acquired Company allocable to any Pre-Closing Tax Period or the portion of any Straddle Period through the end of the Closing Date (as allocated under Section 8.1(b)), (b) any Transfer Taxes for which Acquired Company is liable under Section 8.1(f), and (c) any and all Taxes of any Person imposed on the Acquired Company as a result of any Tax sharing or Tax allocation agreement, as a transferee or successor, or by contract which Taxes relate to an event or transaction occurring before the Closing.

"**Premises**" means all buildings, improvements, and fixtures thereon comprising or located at the Facility.

"**Privacy Laws**" means (a) HIPAA and (b) state privacy and data security Laws and regulations.

"**Privacy Rule**" means the Standards for Privacy of Individually Identifiable Health Information at 45 CFR, part 160 and part 164, subparts A and E, providing for Federal privacy protections for an individual's PHI held by entities subject to HIPAA requirements and describing patient rights with respect to their PHI.

"**Relief Fund Payment Terms and Conditions**" means the terms and conditions established by the Department of Health and Human Services for the receipt of any funds from the Public Health and Social Services Emergency or other CARES Act programs.

"**Resident Records**" means all books, data and records (including electronic versions thereof) related to the operation of the Facility, including financial and accounting records, customer lists, patient lists, patient charts and care plans, family or emergency contact lists, referral source lists, regulatory surveys and reports, incident tracking reports, advertising and marketing materials and competitive analyses, all policy and procedure manuals, and all records and reports (except for such records and reports where transfer is prohibited by Law) relating to all residents or patients at the Facility.

"**Security Rule**" means HIPAA Security Standards (45 C.F.R. Parts 160, 162, and 164).

"**Seller's Knowledge**" means the actual awareness of Seller as to the existence or absence of facts or circumstances.

"**Software**" means computer software or firmware in any form, including object code, source code, computer instructions, commands, programs, modules, routines, applicable program interfaces, procedures, rules, libraries, macros, algorithms, tools, and scripts, and all documentation of or for any of the foregoing.

"**Straddle Period**" means a Tax period of the Acquired Company that begins on or before the Closing Date and ends on or after the Closing Date.

"**Tax**" means any federal, state, local or foreign income, gross receipts, franchise, estimated, alternative minimum, add-on minimum, sales, use, ad valorem, production, transfer, registration, value

added, excise, natural resources, severance, stamp, occupation, premium, windfall profit, environmental, customs, duties, real property, personal property, capital stock, unclaimed property, escheat, social security, unemployment, disability, payroll, license, employee or other withholding, or other tax, of any kind whatsoever, including any interest, penalties or additions to tax or additional amounts in respect of the foregoing; the foregoing shall include any transferee, successor or secondary liability for a Tax.

"**Tax Authority**" means any Governmental Entity having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"**Tax Returns**" means returns, declarations, reports, claims for refund, information returns or other documents (including any related or supporting schedules, statements or information) filed or required to be filed in connection with the determination, assessment or collection of any Taxes of any party or the administration of any Laws, regulations or administrative requirements relating to any Taxes.

"**Taxable Period**" means any period prescribed by any Governmental Entity for which a Tax Return is required to be filed or a Tax is required to be paid.

"**Third Party Claim**" shall mean any claim, suit, or proceeding (including, without limitation, a binding arbitration or an audit by a taxing authority) that is instituted against an Indemnified Party by a Person or entity other than the Indemnifying Party and which, if prosecuted successfully, would result in a Loss for which such Indemnified Party is entitled to Indemnification hereunder.

"**Transaction Documents**" means, with respect to any Person, all agreements, contracts, certificates, schedules, exhibits and other documents executed by such Person in connection with the Contemplated Transaction.

"**Transfer Taxes**" means any real property transfer, excise, sales, use, documentary, transfer, stock transfer, unit transfer, and stamp Taxes, any transfer, recording, registration, and other fees, and any similar Taxes imposed on either the Contemplated Transactions or any deemed transactions contemplated by, or related to, this Agreement and all transactions involving the ownership, acquisition, or perfection of security interests (for the avoidance of doubt, Transfer Taxes do not include any Taxes imposed, in whole or in part, on the basis of net income by any Tax Authority).

"**Treasury Regulations**" means the regulations promulgated by the U.S. Department of the Treasury under the Code.

"**Venue**" means Orange County, California.

   **Section 1.2**   <u>**Interpretation**</u>.  The headings preceding the text of Sections and Subsections included in this Agreement and the headings to the Schedules and Disclosure Schedules attached to this Agreement are for convenience only and shall not be deemed part of this Agreement or the Schedules or be given any effect in interpreting this Agreement, the Schedules or the Disclosure Schedules. The use of the masculine, feminine or neuter gender or the singular or plural form of words herein shall not limit any provision of this Agreement.  The use of the terms "including" or "include" shall in all cases herein mean "including, without limitation" or "include, without limitation," respectively, or "including but not limited to."  The words "delivered," "made available," "furnished," "provided" and words of similar import used herein shall be deemed to include providing such information to Buyer via the Acquired Company's virtual data room website no later than three (3) Business Days prior to the date hereof.  The phrase "date hereof" shall mean the date of this Agreement.  Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement.  Reference to a Person in a particular capacity excludes such Person in any other capacity.

Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof.  Underscored references to Sections, Subsections, paragraphs, clauses, Exhibits, Schedules or Disclosure Schedules shall refer to those portions of this Agreement.  The use of the terms "hereunder," "hereof," "hereto" and words of similar import shall refer to this Agreement as a whole and not to any particular Section, paragraph or clause of, or Exhibit, Schedule or Disclosure Schedule to, this Agreement.

## Article 2
## Purchase and Sale, Earnest Money

**Section 2.1** **Transfer of Acquired Interests**.  Subject to the terms and conditions of this Agreement, at Closing Seller shall transfer to Buyer and Buyer shall accept, at Closing, in their then current condition all of the right, title, and interest in and to the Acquired Interests (as defined in Section 2.6).

**Section 2.2** **Purchase and Sale of the Acquired Interests**.  On the terms and subject to the conditions of this Agreement, at the Closing, the Seller shall assign, transfer and deliver the Acquired Interests to Buyer, free and clear of all Liens, (except any Liens that the Buyer agrees to accept at Closing) and Buyer shall accept the Acquired Interests from the Seller Parties.

**Section 2.3** **Purchase Price for the Acquired Interests; Right to Elect to Have Transaction Taxed as Asset Sale; Allocation**.  The aggregate purchase price for the Acquired Interests shall be _____ payable in cash offset by the Estimated Closing Debt as described in Section 2.5 (collectively, the "**Purchase Price**").   Buyer shall have the option to make an election under (any provision of) IRS Rev. Rule 99-6, or any comparable or similar provision of the Internal Revenue Code, in order to have the purchase of the Owned Shares, as contemplated by this Agreement, treated as a purchase of the assets of the Company for taxation purposes.  Of the Purchase Price funds, _____ will be allocated to the purchase of the Acquired Interests of Windflower, with the remaining Purchase Price funds allocated to the purchase of the Acquired Interests of 625.  Property taxes and other real property-related expenses will be prorated at Closing.

**Section 2.4** **Earnest Money**.  Buyer shall deposit with Old Republic National Title Insurance Company, 261 South Figueroa Street, Suite 260, Los Angeles, CA 90012 (the "Escrow Company" an earnest money deposit in the total amount of _____ (the "**Earnest Money**").  _____ (the "**Initial Deposit**") shall be deposited upon the execution of this Agreement.  In the event Buyer does not terminate the Transaction Documents within fifteen (15) days following the execution of this Agreement (the "**Due Diligence Period)**", Buyer shall deposit an additional _____ (the "**Additional Deposit**", and collectively with the Initial Deposit, the "**Deposit**").  The Deposit shall be nonrefundable following the expiration of the Due Diligence Period, except in the event of a failure of the Closing to occur within one hundred eighty (180) days following the date of this Agreement for any reason not caused by a Buyer default, including the failure of a Buyer closing condition (the "**Non-Refundable Period**"), provided, however, should the Closing not occur due to the Merger Agreement failing to close within such period, or the FTC (as defined below) not granting its approval of this Agreement within such period, the Non-Refundable Period shall extend automatically for an additional ninety (90) days.

**Section 2.5** **Payments at Closing**.  The Purchase Price shall be paid by wire transfer of immediately available funds to an account designated by Seller.  Buyer shall receive a credit to the Purchase Price in an amount equal to the unpaid quality assurance fees assumed on the Closing Date, as set forth on Schedule 2.5(a)  (the "**Assumed Unpaid Quality Assurance Fees**") and a credit to the Purchase Price in

an amount equal to those certain Medicare Advance Payments assumed by Buyer on the Closing Date, as set forth on Schedule 2.5(b) (the "**Assumed Medicare Advance Payments**"; and collectively with the Assumed Unpaid Quality Assurance Fees, the "**Estimated Closing Debt**").

        **Section 2.6**   **"Acquired Interests" and Excluded Assets**. (a) The term "Acquired Interests" means all the business properties, assets, goodwill and rights of Acquired Company of whatever kind and nature, real or personal, tangible or intangible, that are owned by or leased or licensed to Acquired Company as of the Closing Date, and used, held for use or intended to be used primarily in the operation or conduct of the Facility (other than the Excluded Assets, as defined in Section 2.6 (b)), coupled with the Equity Interests, including, without limitation, the following:

        (i)     all real property interests, including fee simple, fixtures, leaseholds, licenses, easements, rights of way and any other interests of Acquired Company in the Premises and the Facility, in each case together with all of Acquired Company's rights, title and interests in all buildings, improvements and fixtures thereon and all other appurtenances thereto;

        (ii)     all supplies and inventories of Acquired Company that on the Closing Date are located on the applicable Premises, and all supplies of Acquired Company (in transit, on consignment or in the possession of any third party) on the Closing Date that are used, held for use or intended to be used primarily in the operation or conduct of the Facility, which shall, at the minimum, be in an amount sufficient for seven (7) days of operations;

        (iii)     all other owned tangible personal property and interests therein, including all trade fixtures, machinery, furniture, furnishings, vehicles of Acquired Company that are used, held for use or intended to be used primarily in the operation or conduct of the Facility and equipment, including computers and databases, provided, however, all such websites, phone numbers and or web addresses transferred shall not include references to "Plum", "Plum Healthcare Group", or any derivation thereof, and further provided such equipment transferred shall only include non-confidential facility data;

        (iv)     all trademarks, trademark registrations, trademark applications, service marks, trade names, business names, brand names, copyrights, copyright registrations, web sites, web addresses, telephone and facsimile numbers, and all rights to any of the foregoing, of Acquired Company that are used, held for use or intended to be used primarily in the operation or conduct of the Facility (the "**Intellectual Property**");

        (v)     all licenses and Permits of Windflower that are used, held for use or intended to be used primarily in the operation or conduct of the Facility, including all provider numbers and the bed rights of the Acquired Company (for up-to 90 licensed SNF beds);

        (vi)     all contracts (including purchase orders and sales orders), subleases, licenses, indentures, agreements, provider agreements, managed care contracts, commitments, certificates of need and all other legally binding arrangements, whether oral or written to which Windflower is a party in connection with the Facility which Purchaser expressly elects to assume, as well as all patient admission agreements, arbitration agreements and patient files (the "**Windflower Company Assigned Contracts**");

        (vii)     all rights, claims, warranties, studies, and credits to the extent relating to any other Acquired Interest, including all guarantees, warranties, indemnities and similar rights in favor of Acquired Company in respect of any other Acquired Interest;

        (viii)     all records of every type and nature related to any of the Acquired Interest, including all corporate or company records, including all books of account; ledgers; general, financial,

9

accounting and personnel records; Resident Records, files; invoices; patient lists, resident lists and supplier lists; other distribution lists; billing records; sales and promotional literature; manuals; and patient, resident and supplier lists and correspondence (in all cases, in any form or medium), of Acquired Company that are used, held for use or intended to be used primarily in, or that arise primarily out of, the conduct or operation of the Facility (collectively, the "**Records**");

(xi)    all goodwill generated by or associated with the Facility ("**Goodwill**");

(xii)    all Equity Interests of Acquired Company; and

(xiii)    the Purchased Bank Accounts (as defined in Section 8.4, below), subject to Seller's right to withdraw and retain all (non-trust account) cash therein at the time of Closing.

(b)    The term "Excluded Assets" means:

(i)    All assets identified on Schedule 2.6(b);(ii)    All cash and Cash Equivalents, securities, Accounts Receivable (including third party settlements and all Medicare and Medi-Cal receivables) prepaid expenses, deferred charges, prepaid accounts, advance payments, utility deposits and inter-company accounts/payables of Acquired Company;

(iv)    all of Seller's privileged financial records;

(v)    all insurance policies

(vi)    all rights of Acquired Company under this Agreement and the other agreements and instruments executed and delivered in connection with this Agreement.

**Section 2.7    Assumption of Certain Liabilities By Buyer and Retention of Certain Liabilities by Seller.**

(a)    Assumption of Liabilities by Buyer. Upon the terms and subject to the conditions of this Agreement, Buyer shall assume, effective as of the Closing, and from and after the Closing, Buyer shall pay, perform and discharge when due, all the following liabilities, obligations and commitments of Acquired Company as of the Closing Date (the "Assumed Liabilities"):

(i)    all liabilities, obligations and commitments of Acquired Company under each of the Windflower Company Assigned Contracts being assumed by Buyer to the extent such liabilities, obligations and commitments relate to the period from and after the Closing; and

(ii)    the Estimated Closing Debt.

(b)    Retention of Liabilities by Seller. Notwithstanding the foregoing, or any other provision of any Transaction Document, and regardless of any disclosure to Buyer, Buyer shall not assume any Excluded Liability (as defined below), each of which shall be retained and paid, performed and discharged when due by Seller.  The term "Excluded Liability" means:

(i)    any liability, obligation, Tax, account payable, or commitment of Acquired Company, except as specifically set forth in this Agreement relating to or arising out of the operation of the Facility, whether express or implied, liquidated, absolute, accrued, contingent or otherwise, or known or unknown, and based upon, arising out of or resulting from any fact, circumstance, occurrence, condition,

act or omission existing on or occurring prior to the Closing, including, without limitation, any inter-company Debt and any liability for required refunds (clawbacks) related to any stimulus grants or funds received by Seller;

(ii)   any liability, obligation or commitment of Acquired Company (A) arising out of any actual or alleged breach by Acquired Company of, or nonperformance by Acquired Company under, any Contract (including any Assigned Contract) prior to the Closing;

(iii)   any liability, obligation or commitment of Acquired Company arising out of (A) any suit, action, investigation or proceeding brought by or involving any person (a "**Proceeding**") pending, threatened or arising before the Closing Date, or (B) any actual or alleged violation by Acquired Company,  of any Law prior to the Closing;

(v)   any liability, obligation or commitment of Acquired Company that relates primarily to, or that arises primarily out of, any Excluded Asset, or that arises out of the distribution to, or ownership by Seller of the Excluded Assets or associated with the realization of the benefits of any Excluded Asset;

(vi)   any liability, obligation or commitment for income, capital gains, excise, estate, inheritance, gross receipts, business, corporation or franchise taxes, fees or penalties, value-added and other similar Taxes related amounts incurred by any person in connection with this Agreement and the other transactions contemplated hereby and thereby;

(viii) any liability, obligation or commitment of Acquired Company that relates to, or that arises out of, services rendered by or on behalf of Acquired Company  prior to the Closing Date (including claims of negligence, personal injury, elder abuse, workers' compensation, employer's liability or other similar claims);

(iv) any indebtedness (including Debt) of Acquired Company;

(x) any liability, obligation or commitment of Acquired Company relating to workers' compensation arising from any act, omission or event occurring prior to the Closing;

(xii) any professional liability or general liability of Acquired Company arising from acts, omissions or events occurring prior to the Closing;

(xvi) any liability for Medicare or Medi-Cal recoupments or claims in connection with payments made to or for the benefit of Acquired Company prior to the Closing.

**Section 2.8      Due Diligence; Termination**.  Buyer shall have until the expiration of the Due Diligence Period within which to review and approve, or seek additional information from the Seller concerning any aspect of this transaction, including, without limitation, the Acquired Interests, the Facility, the assets of the Acquired Company, and so forth.  Buyer shall have discretion to request any additional information from Seller as Buyer reasonably requires, which additional information shall be provided as expeditiously as reasonably possible, and in no event later than five (5) business days following the date of the request for additional information (which request for additional information may be made in writing, such as by e-mail or verbally).  Seller shall reasonably make available key employees, administrators, or other persons most knowledgeable with respect to questions raised by Buyer, during regular business hours, for discussions pertaining to this transaction, and to the extent they do not know the answer to any question(s) posed by Buyer or its representatives or agents, Seller shall reasonably make available any other key employees or outside consultants who would be able to fully respond to the particular inquiry.  Seller

further agrees to reasonably make available, within a reasonably prompt time period, upon request, any documents, books and records, information, inventories, and access to the physical Facility, as Buyer may reasonably request.  Buyer may engage any professional studies it reasonably requests as part of its standard due diligence investigation.  Seller hereby agrees to cooperate fully in the exchange of information discussed in this paragraph.  As applicable, supporting documentation concerning the matters described in the Disclosure Schedule should be provided and cross-referenced.  At any time before the expiration of the Due Diligence Period, Buyer may terminate this transaction by written notice to Seller, in which event it shall receive a full refund of its Earnest Money subject to Section 2.04.

**Article 3**
**Closing**

Section 3.1     **Time of the Closing**.  Subject to the provisions of this Agreement, the closing (the "**Closing**") shall occur no later than five (5) days following the closing of the Merger Agreement and approval by the FTC (the "**Closing Deadline**" and the date the Closing actually occurs is hereinafter the "**Closing Date**").  The Closing shall occur by the exchange of executed documents by PDF, electronic mail communications, or in such other manner as the parties hereto may mutually agree upon after the date hereof.

Section 3.2     **Procedure at the Closing**.  At the Closing, the parties shall take the following actions and all such actions shall be deemed to have occurred simultaneously:

(a)     **Deliveries of the Seller**.  The Seller shall deliver or cause to be delivered to Buyer:

(i)     An Assignment of (all) Membership Interests for each of the Acquired Companies in a form acceptable to Buyer, together with all original membership interest certificates for each Acquired Company, duly executed and endorsed with all legends therein being completed, and a certificate certifying: (a) the organizational documents of such entity; (b) resolutions of the governing body and Member(s)  of such entity approving this Agreement, each applicable Transaction Document to which such entity is party, and the Contemplated Transactions and transactions contemplated under the Transaction Documents; and (c) incumbency and specimen signatures with respect to the officers, partners or managers, as the case may be, of the Acquired Company, as applicable;

(ii)     A Certificate of Good Standing (or its equivalent) of the Acquired Company issued by the Secretary of State of California, as applicable, and each state in which the Acquired Company is otherwise formed or qualified to do business as set forth on Schedule 3.2(a)(ii), showing the Acquired Company to be in good standing in those states, each certificate dated as of a date not more than ten (10) days prior to the Closing Date;

(iii)     A non-foreign person affidavit dated as of the Closing Date from Seller, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Sections 1445 and 1446 of Code, stating that Seller is not a "**foreign person**" as defined in Sections 1445 and 1446 of the Code;

(iv)     Executed payoff letters, releases, discharges, mortgages, or other similar instruments and the release of all Liens granted with respect thereto, together with all instruments, documents, and UCC financing statements;

(v)     Evidence of termination of any agreements between Acquired Company and its then pre-closing affiliates with respect to the Acquired Company or the Acquired Interests,

12

including, without limitation, the voting of the Acquired Interests, and any other agreements affecting the Acquired Interests;

(vi)     Resignations of all officers, managers and directors of the Acquired Company (solely with respect to such positions and, except as otherwise directed by Buyer, not with respect to employment);

(vii)     All the company records and company seal of the Acquired Company;

(viii)     Original title documents for all titled equipment, including an executed copy of the bill of sale (the "**Bill of Sale**") in favor of Buyer, substantially in the form attached hereto as Schedule 3.2(a)(viii);

(ix)     All keys to the Facility;

(x)     Completed/executed (where appropriate) pages 5 and 38 of Centers on Medicare & Medicaid Services Form 855A;

(xi)     Assignments of the Acquired Interests from Seller in form and substance satisfactory to Buyer, duly executed by Seller;

(xii)     Such bank documentation as is necessary to give Buyer control of the Purchased Bank Accounts, in accordance with Sections 2.6(xiii) and 8.4;

(xiii)     Such other instruments and documents as are reasonably necessary to satisfy the conditions precedent to Buyer's obligations hereunder;

(b)     **Buyer's Deliveries**.  Buyer shall deliver or cause to be delivered to the Seller:

(i)     The Purchase Price;

(ii)     A duly executed counterpart copy of the OTA; and

(iii)     Such other instruments and documents as are reasonably necessary to satisfy the conditions precedent to the Seller's obligations hereunder.

**Section 3.3     Conditions to Obligation of Buyer**.  The obligation of Buyer to purchase and pay for the Acquired Interests is subject to the satisfaction or waiver on or prior to the Closing of the following conditions:

(a)     Buyer shall have obtained commercial financing for the acquisition of the Acquired Interests;

(b)     No material adverse change in the condition of the Facility prior to the Closing Date;

(c)     Evidence of the purchase of Tail Insurance by Seller (as defined below), with Buyer having the option, in the event the Tail Insurance policy has not been bound by Seller before Closing, to bind and pay for the same, and reduce the Purchase Price on a dollar-for-dollar basis for the cost thereof; and

(d)     The representations of the Seller in this Agreement as to materiality shall be true, correct, and complete and those not so qualified shall be true, correct and complete in all material respects, as of the date hereof and as of the Closing Date as though made on such Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties qualified as to materiality shall be true, correct, and complete, and those not so qualified shall be true, correct, and complete in all material respects, on and as of such earlier date.

(e)     Seller shall have taken no action to encumber the real property owned by 625 in a manner which would cause an additional exception to title to be added to Schedule B, Part II, on the Commitment for Title Insurance issued by First American Title Insurance Company (File No. NCS-1041118-08-SA1), dated April 28, 2021, at 7:30 a.m. (the "**Title Commitment**").

**Section 3.4      Conditions to Obligation of Seller**. The obligation of Seller to grant, sell, assign, transfer, convey and deliver the Acquired Interests is subject to the satisfaction or waiver by Seller on or prior to the Closing of the following conditions:

(a)     Buyer shall have paid the Purchase Price and all other monies due in a timely fashion and shall have furnished Seller with all other documents, certificates, and other instruments required to be furnished to Seller by Buyer pursuant to the terms hereof.

(b)     As of the Closing, the FTC shall have approved the Transaction Documents and issued its final approval;

(c)     Concurrent or prior to the Closing, the transactions contemplated by the Merger Agreement shall have been consummated; and

(d)     The representations of the Purchaser in this Agreement as to materiality shall be true, correct, and complete and those not so qualified shall be true, correct and complete in all material respects, as of the date hereof and as of the Closing Date as though made on such Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties qualified as to materiality shall be true, correct, and complete, and those not so qualified shall be true, correct, and complete in all material respects, on and as of such earlier date.

**Section 3.5   Pro-rations**.  Pro-rations shall be payable at the Closing, provided that if it is determined after the Closing Date that any Pro-rations are payable by Seller, such amount shall be paid by Seller within ten (10) days of written demand.

**Article 4**
**Representations and Warranties of the Seller and the Acquired Company**
**With Respect to the Acquired Company**

To induce Buyer to enter into this Agreement and to consummate the Contemplated Transactions the Seller and the Acquired Company, jointly and severally, represents and warrants to Buyer that at and as of the date hereof, and at and as of the Closing, each of the statements contained in this <u>Article 4</u> are true, correct and complete in all respects.

**Section 4.1** <u>Organization, Incorporation, Power and Authority; Subsidiaries</u>.

(a) Each Acquired Company is a limited liability company duly organized, validly existing and in good status under the Laws of the State of California. Each Acquired Company has all requisite power and authority to enter into this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated under the same. This Agreement and each other Transaction Document to which an Acquired Company is (or will be) a party (i) has been duly executed and delivered by the Acquired Company, and (ii) is a legal, valid and binding obligation of the respective Acquired Company enforceable against the respective Acquired Company in accordance with its terms (assuming due authorization, execution and delivery thereof by each other party thereto), except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar Laws affecting the rights of creditors generally and the availability of equitable remedies.

(b) Section 4.1(b) of the Disclosure Schedule lists the directors, managers and officers of each Acquired Company as of the date hereof.

**Section 4.2** <u>Ownership of Acquired Interests</u>.

(a) Except for the Acquired Interests, there are no other issued or outstanding Equity Interests of the Acquired Company, and no authorization therefor of any member or manager of either Acquired Company has been given. There are no outstanding subscriptions, preemptive rights, warrants, calls or options to acquire, or instruments or securities convertible into or exchangeable for, or agreements or understandings with respect to the sale or issuance of any Equity Interests of either Acquired Company. Neither Acquired Company has granted any rights to have its Equity Interests registered for sale to the public pursuant to the Laws of any jurisdiction. The Acquired Companies have good and marketable title to all of their respective assets, free and clear of all Liens, including all assets included in the Balance Sheet (as defined below). Immediately following Closing, Buyer will have good title to all of the Acquired Interests, free and clear of all Liens. Each Acquired Company has sole custody and control of all of its respective assets, which assets, include all assets, properties, rights and interests necessary or desirable for the continued operation after Closing Business in the ordinary course and in a similar manner to which it was operated prior to the Closing Date.

(b) To Seller's Knowledge all tangible assets owned or used by each Acquired Company are in good operating condition and repair, reasonable wear and tear excepted. There are no declared or authorized but unpaid dividends or distributions with regard to any of the Acquired Interests and the Acquired Company is in material compliance with all applicable federal and state securities Laws.

**Section 4.3** <u>No Consent; Restrictions</u>. Except as set forth on <u>Section 4.3 of the Disclosure Schedule</u>, to Seller's Knowledge, the execution and delivery of the Transaction Documents and the performance and compliance with their terms by the respective Acquired Company and the Seller will not:

(a)      Require consent of, notice to, filing with, or license or permit from any Person or conflict with, or result in the breach of, or trigger or accelerate any right or obligation (including prepayment penalties), or constitute a default or an event of default or an occurrence, circumstance, act or failure to act that, with the passage of time, the giving of notice, or both, would become a default;

(b)      Result in a breach of any of the terms or conditions of, or constitute a default under, or in any manner release any party thereto from any obligation under any Contract, except for any default resulting from the assignment of Contracts without consent;

(c)      Violate or conflict with any Order of any court, administrative agency or Governmental Entity to which Seller is subject;

(d)      Constitute an event which would permit any party to terminate any Contract or accelerate the maturity of any Debt;

(e)      Violate any provision of the organizational documents of Seller; or

(f)      result in the creation or imposition of any Liens upon the Acquired Interests or the Acquired Company's assets.

**Section 4.4      Financial Statements**. (a) Schedule 4.4 sets forth the balance sheet and cash flows of Acquired Companies as of December 31, 2018, December 31, 2019, and December 31, 2020 (the "**Balance Sheet**"), and the unaudited statements of income and cash flows of Acquired Company for the six (6) month period ended June 30, 2021, including the related schedules and notes (collectively, the "**Financial Statements**"). The Financial Statements have been prepared from the books and records of Seller, as applicable, in conformity with generally accepted accounting principles consistently applied ("GAAP") (except in each case as described in the notes thereto) and on that basis fairly present (subject, in the case of the unaudited statements, to normal, recurring year end audit adjustments) the financial condition and results of operations of the Facility as of the respective dates thereof and for the respective periods indicated. The books and records of each Acquired Company accurately, fairly and correctly set out and disclose, in all material respects, all financial transactions of the respective Acquired Company relating to the Facility for the periods noted therein. To Seller's knowledge, the Facility does not have any material liabilities or obligations of any nature (whether accrued, absolute, contingent, unasserted or otherwise), except (i) as disclosed, reflected or reserved against in the Balance Sheet and the notes thereto, (ii) for items set forth in Schedule 4.4, and (iii) for liabilities and obligations incurred in the ordinary course of business consistent with past practice since the date of the Balance Sheet and not in violation of this Agreement. To Seller's Knowledge, the accounting for advance payments and patient trust fund accounts provided to Buyer by Seller is accurate in all material respects.

**Section 4.5      Absence of Certain Changes to Balance Sheet**. To Seller's Knowledge, there has been no change, event or condition of any character (whether or not covered by insurance), which, in the aggregate, has had or may be expected to have a Material Adverse Effect to the Balance Sheet. Except as otherwise specifically contemplated by this Agreement or the other Transaction Documents or set forth in the corresponding paragraph of Section 4.5 of the Disclosure Schedule, the Acquired Company has conducted its business only in the ordinary course of business and consistent with past practices and, without limiting the generality of the foregoing, the Acquired Companies have not:

(a)      issued, or authorized for issuance, any Equity Interests;

(b)      incurred any Debt, or incurred any other obligation or liability, except in the ordinary course of business and consistent with past practice;

(c)      mortgaged, pledged, or otherwise encumbered any of its assets or properties, except in the ordinary course of business and consistent with past practice;

(d)      changed any accounting practices, policies or principles or revalued any of its assets, including writing down the value of inventory or any other asset or writing off notes or accounts receivables, nor has it discounted any receivables, accelerated orders or receivables or other items that would otherwise reasonably be expected to occur in subsequent periods, nor modified the timing, course of conduct or other cash management activities with respect to the collection of all Accounts Receivable;

(e)      suffered any damage to or destruction of any material assets or properties or suffered any casualty or extraordinary losses, whether or not covered by insurance;

(f)      taken or committed to take any action or omit to take any action that would cause any of its representations and warranties herein to become untrue in any material aspect;

(g)      made, changed or revoked any election in respect of Taxes, adopted or changed (or requested to change) any accounting method in respect of Taxes, entered into any closing agreement, settled or compromised any claim or assessment in respect of Taxes, amended any Tax Returns, or consented to any extension or waiver of the limitation period applicable to any claim or assessment in respect of Taxes;

(h)      amended, terminated, cancelled or compromised any material claims of the Acquired Company or waived any other rights of substantial value to the Acquired Company;

(i)      failed to pay any creditor any amount owed to such creditor when due;

**Section 4.6**      **Business Names**.  To Seller's Knowledge, each Acquired Company has the entire and exclusive right to use the names listed on Section 4.6 of the Disclosure Schedule.

**Section 4.7**      **Real Property and Improvements**.

(a)      No condemnation, expropriation, zoning change or similar proceeding is pending or, to Seller's Knowledge, threatened that would preclude or impair the use or operation of any real property by the Acquired Company; the real property is zoned by the appropriate Governmental Entities to allow for the operation of the Facility.

(b)      To Seller's Knowledge, the Acquired Companies have good and marketable title to all real property and other assets owned by them, free and clear of all liens.

(c)      There are no pending actions which would materially affect the present use the real property.

(d)      None of the Acquired Companies owes any leasing or brokerage commissions with respect to the real property

(e)      None of the Acquired Companies have received notice of any pending condemnation or similar proceeding affecting any portion of the real property, and to Seller's Knowledge, no such action is presently contemplated.

(f)      To Seller's Knowledge, the real property has legal access to a public road and to all utilities necessary for the operation of such real property as currently operated.

(g)      To Seller's Knowledge, the Premises and the use thereof comply in all material respects with (i) all Laws related to zoning, subdivision and land use. (ii) all applicable health, fire, building codes and parking laws, and (iii) all other Laws applicable to the Premises, including the Americans with Disabilities Act and Healthcare Laws.  To the Seller's Knowledge, there are no illegal activities relating to controlled substances on the Premises.

**Section 4.8      Contracts**.  Section 4.8 of the Disclosure Schedule sets forth a complete and accurate list of each Contract (including for each Contract reference to the applicable subsection of this Section 4.8, including all amendments, supplements and other modifications thereto, to which the Acquired Company is a party, by which it is bound, or which is used at the Facility.  To Seller's Knowledge, each Contract required to be listed on Section 4.8 of the Disclosure Schedule is in effect and enforceable and there exists no breach, violation or default under any such Contract by the Facility.

**Section 4.9      Intellectual Property**.
(a)      Section 4.9 of the Disclosure Schedule lists all Intellectual Property in the name of the Acquired Company or in which it has any rights, licenses, or authorizations in each case other than Software.  Section 4.9 of the Disclosure Schedule also lists all licenses and other rights granted by the Acquired Company to any third Person with respect to any of the Intellectual Property and licenses and other rights granted by any third Person to the respective Acquired Company.  Except as set forth on Section 4.9 of the Disclosure Schedule, (i) the respective Acquired Company owns and possesses all right, title and interest in and to, or has a valid license to use, and following completion of the Contemplated Transactions, will own or have a valid license to use, all of the Intellectual Property used in or necessary for the operation of the Business as presently conducted and none of such Intellectual Property has been abandoned and no proceeding by any third Person contesting the validity, enforceability, use or ownership of any such Intellectual Property has been made, is currently outstanding or is, to the Seller's Knowledge, threatened, and there is no reasonable basis for any such proceeding.

**Section 4.10      No Litigation**.  Except as set forth on Section 4.10 of the Disclosure Schedule, there is no action, lawsuit, claim, grievance, charge proceeding or Order of any kind pending, resolved or, to the Seller's Knowledge, threatened against either Acquired Company relating to the Facility.  For any litigation, claim or other proceeding disclosed on Section 4.10 of said schedule, to the extent available, Seller shall provide via e-mail (or in the event Seller becomes aware of such litigation in the 72-hour period prior to the Closing, verbally) (1) the name, address and contact information for the attorney representing Seller in any said litigation, (2) a summary description of the nature of the litigation, claim or assessment, (3) a description of the progress of the case to date, (4) a description of how the Seller's management is responding or intends to respond to the litigation (*e.g.*, to contest the case vigorously or seek an out-of-court settlement), (5) an evaluation of the likelihood of an unfavorable outcome and an estimate, if one can be made, of the amount or range of potential loss, (6) the status of carrier negotiations and tender of the defense, and (7) any other material information about the case that is necessary to fully disclose its nature or scope that is not specifically requested in items 1-6, above.  In addition to the foregoing, the pleadings and expert reports for all litigation shall all be made available to the Buyer on the Effective Date, and at any time thereafter, upon the Buyer's request.  None of the Acquired Companies, the Acquired Interests or the Acquired Companies' Equity Interests is subject to any outstanding Order.  Neither Acquired Company has commenced any claim, suit, action, or other proceeding of any kind against a third party, nor to Seller's Knowledge is there any ground for any such claim, suit, action or proceeding.

**Section 4.11      Tax Matters**.  Except as set forth on Section 4.11 of the Disclosure Schedule, to Seller's Knowledge:

18

(a)     All Tax Returns required to have been filed by or on behalf of the respective Acquired Company have been timely filed.  All such Tax Returns are true, correct and complete and were prepared in accordance with applicable Laws.  The Acquired Companies are not currently the beneficiary of any extension of time within which to file any Tax Return.

(b)     Each Acquired Company has timely paid all income taxes and other material Taxes due and payable by it (whether or not shown on any Tax Return).  There are no Liens with respect to Taxes upon any assets or Equity Interests of either Acquired Company.

(c)     No deficiency or proposed adjustment for Taxes has been assessed by any Tax Authority against either Acquired Company that has not been paid or resolved (other than those not yet due and payable by the Acquired Company).  Seller nor either Acquired Company is currently the subject of a Tax audit, examination or other proceeding concerning any Tax liability or Tax Return of an Acquired Company or concerning any Tax liability or Tax Return with respect to an Acquired Company.  Neither Acquired Company is contesting any Tax liability alleged to be owed by the Acquired Company.  Neither Acquired Company has received from any Tax Authority any written notice of proposed adjustment, deficiency, or underpayment of Tax liability for which an Acquired Company may be liable which has not since been satisfied by payment or been withdrawn, or of proposed adjustment to any Tax item or any Tax Return.  No waivers or extensions of any statutes of limitation have been given or requested with respect to either Acquired Company in connection with any Tax Returns covering an Acquired Company with respect to any Taxes payable by an Acquired Company that remain in effect, nor has either Acquired Company agreed to nor is either Acquired Company subject to any extension of time with respect to a Tax assessment that remains in effect.

(d)     The amount of the respective Acquired Company's liability for unpaid Taxes for all periods ending on or before the date of the most recent Financial Statements, in the aggregate, does not exceed the amount of accruals for Taxes (excluding reserves for deferred Taxes) reflected on the Financial Statements. The amount of both Acquired Companies' collective liability for unpaid Taxes for all periods following the end of the most recent period covered by the Financial Statements shall not, in the aggregate, exceed the amount of accruals for Taxes (excluding reserves for deferred Taxes) as adjusted for the passage of time in accordance with the past custom and practice of the Acquired Companies (and which accruals shall not exceed comparable amounts incurred in similar periods in prior years).

(e)     Each Acquired Company is presently a limited liability company and is and has been a valid and properly classified partnership for U.S. Federal (and applicable state and local) income Tax purposes from all times from its date of formation.

Section 4.12     **Legal Compliance**.  Except as set forth on 0 of the Disclosure Schedule, as of the date of this Agreement, Windflower holds all permits, licenses, approvals, certificates and other authorizations, including Medicare and Medi-Cal provider numbers, of and from all applicable Governmental Entities necessary for the lawful conduct of the Facility.

Section 4.13     **Healthcare Compliance**.

(a)     Windflower has the requisite provider agreements and is in compliance with all Laws and contractual obligations required to bill Medicare, the respective Medicaid program in the state or states in which such entity operates, including Medi-Cal, and all other Payors that Windflower currently bills.  There is no investigation, audit, claim review, or other action pending, or to the Seller's Knowledge,

threatened, relating to any offense of a Payor program or which could result in a revocation, suspension, termination, probation, limitation, or non-renewal of any provider agreement or result in the exclusion of Windflower from participation in any Payor program.

(b)     Windflower has established and implemented a corporate compliance plan, including policies and procedures and a code of ethics, to promote compliance and detect non-compliance of Windflower and its directors, officers and employees with all applicable Healthcare Laws.

**Section 4.14**.   **HIPAA.**   Windflower has used and disclosed Protected Health Information (as defined in 45 C.F.R. § 160.103) to perform functions, activities or services only in accordance with the limitations set forth in the Privacy Laws, and, to the extent applicable, in accordance with limitations set forth in third party agreements to which Windflower is a party.  Windflower has not received any written notice, communication, or information from any Governmental Entity or any other Person regarding, any actual, alleged, possible, or potential violation of, or failure of Windflower to comply with, the Privacy Laws.

**Section 4.15**     **Material Permits**.  Windflower  has obtained and maintains, and is in material compliance with all terms and conditions of, all Material Permits required to be obtained or maintained to own and operate the Facility and assets, including those Material Permits required by the Government Programs in which Windflower participates or by which Windflower is bound. All of the Windflower's employees and independent contractors, and anyone else providing services to or on behalf of Windflower, have obtained and maintain in good standing, and are in compliance with all terms and conditions of, all Material Permits required to be obtained or maintained to perform his or her duties for Windflower. All material applications, notices or other forms required to have been filed for the renewal or extensions of any such Material Permit have been duly filed on a timely basis with the appropriate governmental authority, and neither the Seller nor Windflower has been notified that such renewals or extensions will be withheld, restricted or delayed in any material respect.  Windflower is not in violation of, in nonconformity with or in default under any Material Permit, there is no proceeding pending or threatened to revoke, suspend, limit or terminate any Material Permit, and there is no basis for any revocation, suspension, limitation or termination of any Material Permit.  None of Windflower's employees and independent contractors, or anyone else providing services to Windflower, is in violation of, in nonconformity with or in default under any Material Permit required to be obtained or maintained to perform his or her duties for Windflower, there is no proceeding pending or, to the Seller's Knowledge, threatened that could result in the revocation, suspension, limitation or termination of any such Material Permit, and there is no basis for any revocation, suspension, limitation or termination. The Seller has provided Buyer with true, accurate and complete copies of all of the Material Permits required to operate the Facility, including any such Material Permit required by the Government Programs in which Windflower participates or by which Windflower is bound.

**Section 4.16**     **Employee List**. Section 4.16 of the Disclosure Schedule sets forth a complete and accurate list, as of the date hereof, of all employees of the Acquired Company (the "**Acquired Company Employees**").

**Section 4.17**     **Labor Matters**.  To Seller's Knowledge, Windflower is not a party to, or otherwise bound by, any consent decree with, or citation or other order by, any Governmental Entity relating to employees or employment practices and, to Seller's Knowledge, all employees of Windflower are authorized to work in the United States.  Windflower is not delinquent in payments to any of its employees or consultants for any wages, salaries, overtime pay, commissions, bonuses, benefits, accrued and unused

vacation, or other compensation, if any, for any services or otherwise arising under any policy, practice, Contract, Plan, program or Law.

### Section 4.18    Employee Benefit Plans.

(a)    Section 4.18(a) of the Disclosure Schedule contains a true and complete list of each "employee benefit plan" (within the meaning of Section 3(3) of ERISA) and all equity compensation, deferred compensation, retirement, bonus, incentive, severance, employment, change-in-control, fringe benefit, medical, dental, vision, disability, life insurance, vacation, sick leave, paid time off, and all other employee benefit plans, agreements, programs, policies or other arrangements, whether or not subject to ERISA (including any funding mechanism therefore now in effect or required in the future as a result of the purchase of the Acquired Interests, or otherwise), whether formal or informal, oral or written, legally binding or not, under which (i) any Company Employee has any present or future right to benefits and which are contributed to, sponsored by or maintained by Windflower (for the benefit of Windflower's employees) or any ERISA Affiliate or (ii) Windflower or any ERISA Affiliate  has had, currently has, or may have any actual or contingent present or future liability or obligation.  All such plans, agreements, programs, policies and arrangements shall be collectively referred to as the "**Plans**".  No Company Employee has any rights under any stock purchase, stock option, phantom stock, or other similar agreement which would entitle any employee to receive any stock or equity interests in the Acquired Company.

(b)    To Sellers' Knowledge each Plan has been established and administered in accordance with its terms, and in material compliance with the applicable provisions of ERISA, the Code, the Patient Protection and Affordable Care Act of 2010 (and applicable regulations promulgated thereunder) and other applicable Laws and other contractual obligations;

(c)    To Seller's Knowledge, with respect to each Plan, (i) no actions, suits or claims (other than routine claims for benefits in the ordinary course) are pending or, to Seller's Knowledge, threatened; (ii) to Seller's Knowledge, no facts or circumstances exist that could give rise to any such actions, suits or claims; (iii) no administrative investigation, audit or other administrative proceeding by the Department of Labor, the PBGC, the IRS or other governmental agencies are pending, in progress or, to Sellers' Knowledge, threatened (including any routine requests for information from the PBGC); (iv) no "prohibited transaction" has occurred within the meaning of the applicable provisions of ERISA or the Code; and (v) no reportable event (within the meaning of Section 4043 of ERISA) has occurred, other than one for which the thirty (30) day notice requirement has been waived.

(d)    To Seller's Knowledge, no Plan or Law exists that, as a result of the execution of this Agreement, could (i) result in severance pay, termination indemnity or any similar payment or any increase in severance pay, termination indemnity or any similar payment, (ii) accelerate the time of payment or vesting or result in any payment or funding (through a grantor trust or otherwise) of compensation or benefits under, increase the amount payable or result in any other material obligation pursuant to, any of the Plans, (iii) limit or restrict the right of Windflower to merge, amend or terminate any Plan, (iv) cause Windflower to record additional compensation expense on its income statement, or (v) result in payments under any Plan which would not be deductible under Section 280G of the Code.

(e)    To Seller's Knowledge, all contributions, reimbursements, premiums and other payments (including all employer contributions and employee salary reduction contributions) required to have been made under or with respect to each Plan have been made on a timely basis in accordance with applicable Law and the terms of such Plan.

### Section 4.19    Environmental.

(a)     To Seller's Knowledge, the Acquired Companies are, and at all times have been, in material compliance with all Environmental Laws and Acquired Companies have not taken any action, that has or would reasonably be expected to result in an Acquired Company becoming subject to any claims for violation of Environmental Laws.  To Seller's Knowledge, no claims for violation of Environmental Laws are pending, or threatened against either Acquired Company.

(b)     Except as may be set forth in Section 4.19 of the Disclosure Schedule, for the duration of the time that the facilities, offices or properties owned or leased by the Acquired Company (the "Business Premises") were owned or leased by the Acquired Company, or to the Seller's Knowledge, prior to such time of ownership or possession, there is no condition in, on or under, and no release of Hazardous Materials has occurred or is occurring from, to or through, the Business Premises.  To Seller's Knowledge, none of the Business Premises is on the National Priorities List (also known as a CERCLA or Superfund site) or any similar list or is proposed to be listed.  For the duration of the time that the Business Premises were owned or leased by the Acquired Company or, to the Seller's knowledge, prior to such time of ownership or possession, no remediation, response, investigation, assessment, reclamation, closure or similar activity with respect to any environmental condition or environmental requirement, whether voluntary, pursuant to any contract, permit or order or otherwise, has been or is being conducted by the Acquired Company or, to the Seller's Knowledge, any governmental agency or any other person with respect to the Business Premises.  Except as may be set forth in Section 4.19 of the Disclosure Schedule, there are no underground storage tanks, sumps, septic tanks, asbestos-containing materials, lead-based paint or PCBs in, on or under any Business Premises.  For the duration of the time that the Business Premises were owned or leased by the Acquired Company or to the Seller's Knowledge prior to such time of ownership or possession, none of the Business Premises have been used for the manufacture of gas from coal.  Section 4.19 of the Disclosure Schedule also lists all reports, investigations, sample reports and similar information in the possession or control of the Seller with respect to any environmental subject matter that relates to the Business Premises.  True and complete copies of all listed items shall be delivered to the Buyer on the Effective Date.

(c)     Except as may be set forth in Section 4.19 of the Disclosure Schedule, neither the Acquired Company nor the Business Premises is bound by or subject to any contract, permit or order requiring it to indemnify or hold any person harmless against or otherwise bear, in whole or in part, any costs, damages, expenses, claims, liabilities or other amounts with respect to any Environmental Laws applicable to, or any Hazardous Materials in, on or under, or any release from, to or through, any location, or any investigation, assessment, response, remediation or similar activity with respect to any of the foregoing.  To Seller's Knowledge, none of the real property presently owned or operated by the Acquired Company requires, or is likely to require, any capital expenditure, operating expense or other amount or any change in or limit on its existing facilities or methods of operation, in each case with a view to preventing, reducing the likelihood of, remediating or producing or avoiding any other result or possible result with respect to any Environmental Laws applicable to, or any Hazardous Materials in, on or under, or any release from, to or through, any location.

**Section 4.20     Stimulus Funds**.  Windflower: (i) has not received loans constituting CARES Act PPP Debt; (ii) has received one or more Medicare Accelerated Payments, as specifically detailed and set forth of Schedule 4.20; (iii) has elected to incur CARES Act Deferred Payroll Taxes as specifically detailed an set forth on the Schedule 4.20; and (iv) has received payments constituting CARES Act Provider Relief Fund, as specifically detailed and set forth on Schedule 4.20.  To Seller's Knowledge, Windflower is, and at all times has been, in compliance in all material respects with each requirement under the CARES Act and other applicable Law that is or was applicable to Windflower's receipt, payment, repayment, reimbursement or other use, as applicable, of the loans, funds, payments or deferred Taxes received pursuant to the CARES Act. Without limiting the generality of the foregoing, To Seller's Knowledge, Windflower has only spent or otherwise used such loans, funds, payments, or deferred taxes

in a manner permitted under the CARES Act (or otherwise has qualified for loan forgiveness, if applicable) and any other applicable Law, and Acquired Companies have no repayment or other liabilities that are directly or indirectly attributable to the Acquired Companies' spending or other use thereof.

**Section 4.21    Disclosure**.  None of this Agreement, the Seller Contracts, the Financial Statements, any Schedule, Disclosure Schedule, Exhibit or certificate attached to or delivered under this Agreement, the Seller Contracts, the Financial Statements, or any document or statement in writing that has been supplied by or on behalf of the Seller or the Acquired Company in connection with the Contemplated Transactions, to Seller's Knowledge contains any untrue statement of a material fact, or omits any statement of a material fact necessary in order to make the statements made not misleading.

**Section 4.22    Insurance**.  Section 4.22 of the Disclosure Schedule lists each insurance policy (including fire, theft, casualty, comprehensive general liability, workers compensation, business interruption, environmental, product liability, medical malpractice and automobile insurance policies) to which the Acquired Company is a party, a named insured or otherwise the beneficiary of coverage, all of which are in full force and effect.  The list includes for each insurance policy the type of policy, form of coverage, policy number, name of insurer, amount of any deductibles and expiration date.  All premiums due and payable under all insurance policies of the Acquired Company have been paid and the Acquired Company is not liable for any retroactive premium or similar adjustment.  There is no claim pending under any such policy as to which coverage has been questioned, denied or disputed by the underwriter of such policy.  Section 4.22 of the Disclosure Schedule identifies all claims asserted by the Acquired Company pursuant to any insurance policy and describes the nature and status of each such claim.  The Acquired Company has maintained insurance policies of the type and amount generally deemed adequate to operate its business.

## Article 5
## Seller's Representations and Warranties

To induce Buyer to enter into this Agreement and for the benefit of Buyer, Seller represents and warrants, solely as to such Seller, to Buyer as follows.

**Section 5.1    Authorization**.  Seller has the power, authority and capacity, as applicable, to execute and deliver (i) this Agreement, (ii) the Transaction Documents, and (iii) each other Contract to be executed by Seller in connection herewith to which it is a party (each of (ii) and (iii), the "**Seller Contracts**"), and to consummate the Contemplated Transactions and the transactions set forth therein.  This Agreement, and the Seller Contracts will be at or prior to Closing, duly and validly executed and delivered by Seller.

**Section 5.2    No Consent; Restrictions**.  Except as set forth on 0 of the Disclosure Schedule, the execution and delivery of this Agreement and the Seller Contracts will not (a) require consent of, notice to, filing with, or the issuance of a license or permit from any Person or conflict with, or result in the breach of, or trigger or accelerate any right or obligation (including prepayment penalties), or constitute a default or an event of default or an occurrence, circumstance, act or failure to act that, with the passage of time, the giving of notice, or both, would become a default, or (c) violate or contravene any Law applicable to Seller or by which any of the properties or assets of Seller is bound.

**Section 5.3    Litigation.**  There is no legal proceeding pending or, to Seller's Knowledge, threatened against Seller that questions the validity of this Agreement or seeks to prohibit, enjoin or otherwise challenge the consummation of the transactions set forth in this Agreement.

**Section 5.4    Capitalization**.  All of the issued and outstanding Acquired Interests are

23

owned by Seller

**Article 6**
**Buyer's Representations and Warranties**

To induce the Seller to enter into this Agreement, Buyer represents and warrants as follows:

**Section 6.1     Corporate Status and Authority.**  Buyer is a both a limited liability company (with respect to Sensen) and a corporation, with respect to NAHS North, duly formed, validly existing and in good standing under the Laws of the State of Nevada and has the requisite power and authority to own, operate, and carry on its business.  The execution and delivery of this Agreement and the consummation of the Contemplated Transactions have been validly authorized by all appropriate limited liability company action of Buyer, and this Agreement constitutes the valid and binding obligation of Buyer enforceable in accordance with its terms.

**Section 6.2     Agreement Not in Breach of Other Instruments.**  The execution and delivery of this Agreement and the performance and compliance with its terms by Buyer will not conflict with, or result in the breach of, or trigger or accelerate any right or obligation, or constitute a default under (a) Buyer's organizational documents, (b) any Contract to which Buyer is a party, or (c) any Law or applicable to Buyer.

**Section 6.3     Investigation.**  Buyer is an experienced owner and operator of similar health care facilities and properties and   Buyer has made its own inquiry and investigation into, and, based on its inquiry and investigation and the representations and warranties in this Agreement and the other Transaction Documents, has formed an independent judgment concerning Acquired Company and its operations. Buyer has satisfied itself with respect to the business, results of operations, prospects, condition (financial or otherwise) and assets of the Acquired Company and Facility, based on such Buyer's own inspection and investigation thereof, and Buyer is entering into this Agreement based solely upon such inspection and investigation and not upon any information, data, statements or representations, written or oral, except as contained in this Agreement or any Exhibit or Schedule hereto. Buyer is a knowledgeable, experienced and sophisticated owner and operator of companies engaged in owning and operating skilled nursing facilities and is relying solely on its own expertise and that of Buyer's own consultants in purchasing the Acquired Company. Buyer has conducted such inspections and investigations of the Acquired Company as Buyer deemed necessary. Except as set forth herein, and subject to all of the representations, warranties and covenants of Seller and the Acquired Companies, Buyer is acquiring the Acquired Company(s) and their assets on an "AS IS WHERE IS" basis and has conducted its own due diligence investigations of the Acquired Company and their respective operations, assets and liabilities.  Buyer has no reason to believe that it will not be able to obtain financing for the acquisition of the Acquired Company and has sufficient liquidity of cash to Close and operate the Acquired Company, including, but not limited to, sufficient cash or lines of credit equal to forty-five (45) days times the Acquired Company's Medi-Cal rate times the applicable number of Department of Health licensed beds.

**Section 6.4     No Impediment to CDPH Approval.**  Buyer has received no notices from the California Department of Public Health ("**CDPH**") or any other Governmental Authority indicating that there are facts or circumstances affecting Buyer which shall or might reasonably form a basis for CDPH to deny approval for or to materially restrict or delay the purchase of the Acquired Interests by the Buyer.

**Section 6.5     Required Consents**.  Other than as set forth in this Agreement, no consent, license, approval or authorization of, or filing or registration with, or exemption by, any court or Governmental Authority or any other third party other than the Seller is or will be required to be obtained or made by Buyer in order for Buyer to consummate the transactions contemplated in this Agreement.

Section 6.6     **Brokers or Finders**.  No broker, finder or investment banker is entitled to any fee or commission from any of the Buyer for services rendered on behalf of such Buyer in connection with the Contemplated Transactions.

Section 6.7     **Litigation**.   There are no actions pending or threatened, nor any outstanding judgments, orders, writs, injunctions or decrees of any court, or Governmental Entity, that seek to or would prevent or materially restrict or delay the consummation of the transactions contemplated hereby, or that would materially and adversely affect the ability of Buyer to consummate the transactions contemplated hereby.

**Article 7**
**Indemnification**

Section 7.1     **Survival; Covenants.**

(a)     The respective representations and warranties of the parties contained in this Agreement or in any Schedule to this Agreement will survive the execution and delivery hereof, the Closing Date until the twenty four (24) month anniversary of the Closing Date; except that the representations and warranties of the parties set forth in Section 4.1 "Organization, Incorporation, Power and Authority; Subsidiaries", Section 4.1(a)2 "Ownership of Acquired Interests and Acquired Company Assets", Section 4.3 "No Consent; Restrictions", Section 5.1 "Authorization", Section 5.2 "No Consent; Restrictions", and 0 "Corporate Status and Authority" (collectively, the "**Fundamental Representations**"), shall survive indefinitely.

Section 7.2     **Indemnification by Seller**. Following the Closing, Seller shall indemnify, defend and hold Buyer and its officers, directors, managers, shareholders, members, Affiliates (including the Acquired Company following the Closing Date), employees, representatives and other agents ("**Buyer Indemnified Persons**") harmless from and against, as a result of or arising by reason of, connected to or resulting from, directly or indirectly:

(a)     any breach of or inaccuracy in any of the Seller's representations or warranties contained in this Agreement;

(b)     any breach by the Seller of any covenant or agreement contained in this Agreement;

(c)     any Third Party Claim to the extent that such claimant has not received insurance proceeds by or on behalf of Seller under any applicable insurance policies or any other payment and if resolved in favor of the claimant would constitute a misrepresentation or breach of any representation or warranty made by the Seller in this Agreement, as well as any claim resulting from, directly or indirectly the breach prior to Closing (or arising out the Closing) of those certain Windflower Assigned Contracts to which any Affiliate of Acquired Company is a party.

Section 7.3     **Indemnification by Buyer**.  Buyer will indemnify and hold the Seller harmless from and against, and will reimburse the Seller for, any and all Losses incurred, suffered or paid, directly or indirectly, as a result of or arising by reason of, connected to or resulting from, directly or indirectly, and whether such Losses are to third parties, (a) any breach of or inaccuracy in any of Buyer's representations or warranties contained in this Agreement, (b) any breach by Buyer of any covenant or agreement contained in this Agreement, or (c) any Assumed Liabilities (the "**Seller Indemnified Party**"). Buyer shall also indemnify and hold any Affiliate of Acquired Company harmless from and against, and will reimburse such Affiliate for, any and all Losses incurred, suffered or paid, directly or indirectly, as a

result of or arising by reason of, connected to or resulting from, directly or indirectly the breach (after the Closing) of those certain Windflower Assigned Contracts to which any Affiliate of Acquired Company is a party.

**Section 7.4**     **Third Party Claims**. Any Seller Indemnified Party or Buyer Indemnified Persons (an "**Indemnified Party**") may give to any or all Buyer Indemnifying Persons or Seller Indemnifying Party, as applicable (an "**Indemnifying Party**"), a written notice ("**Claim Notice**") to any claim for Losses ("**Claim**"), including Third-Party Claims. Uncontested Third-Party Claims (or portions thereof), and all other Claims will be paid in full by the Indemnifying Parties within fifteen (15) days of receipt of a Claim Notice.   Claim Notices on Third-Party Claims will be provided promptly after receipt by the Indemnified Party of notice thereof.  The Indemnifying Party may take control of the defense and investigation of any Third-Party Claim, employ and engage attorneys of its choice reasonably acceptable to the Indemnified Party to handle and defend the same, at the Indemnifying Party's sole cost, risk, and expense, and compromise or settle such claim, which compromise or settlement shall be made only with the written consent of the Indemnified Party, which shall not be unreasonably withheld.  The Indemnified Party shall cooperate, at the Indemnifying Parties' expense, in all reasonable respects with the Indemnifying Party and the Indemnifying Party's attorneys in the investigation, trial, and defense of such lawsuit or action and any appeal arising from a Third-Party Claim.  If the Indemnified Party desires to participate in, but not control, any such investigation, defense, compromise, settlement, litigation, and any appeal therefrom, it may do so at the Indemnifying Parties' sole cost and expense. If the Indemnifying Party fails or refuses to undertake the defense of a Third- Party Claim within fifteen (15) days after written notice of such Claim has been given to the Indemnifying Party, the Indemnified Party shall have the right to undertake the investigation, defense, compromise, settlement, litigation, and any appeal therefrom of such claim with counsel of its choosing at the cost and expense of the Indemnifying Party.  In the circumstances described in the preceding sentence, Indemnified Party shall be entitled to make a Claim for all Losses associated with such matter. In connection with the defense, compromise, or settlement of any Third-Party Claim, the Parties to this Agreement shall execute such powers of attorney as may reasonably be necessary or appropriate to permit participation of counsel selected by any Party hereto and, as may reasonably be related to any such claim or action, shall provide access to the counsel, accountants, and other representatives of each Party during normal business hours to all properties, personnel, books, tax records, contracts, commitments, and all other business records of such other Party and will furnish to such other Party copies of all such documents as may reasonably be requested (certified, if requested).

**Section 7.5**     **Intentionally Omitted.**

**Section 7.6**     **Knowledge and Investigation**.  The right of any Indemnified Person to indemnification pursuant to this 0 will be initiated by any investigation conducted or knowledge acquired (or capable of being acquired) at any time, whether before or after the execution and delivery of this Agreement or the Closing, with respect to the accuracy of any Seller representation or warranty, performance of or compliance with any covenant or agreement referred to herein.  The investigations and inquiries made by or on behalf of Buyer and the information, materials and documents supplied to Buyer or its representatives in connection with their review of the Acquired Company were intended to provide Buyer with the comfort necessary for it to enter into this Agreement and are not intended to  limit or affect the representations and warranties of the Seller or the Acquired Company  and to  relieve the Seller from any of their respective indemnity obligations and liabilities in respect thereof.  If a disclosure was made on the Disclosure Schedules by the Seller, and in spite thereof, Buyer closes the transaction, any indemnity obligation from the Seller related to such event will be null and void.

**Article 8**
**Covenants**

Section 8.1   **Tax Matters**.

(a)     The Seller shall timely prepare or cause to be prepared and timely file or cause to be filed all Tax Returns for the Acquired Company for all Pre-Closing Tax Periods that are due after the Closing Date (the "**Pre-Closing Tax Returns**").  The Pre-Closing Tax Returns shall be prepared in a manner consistent with the prior practice of the Acquired Company except to the extent otherwise required by applicable Tax Laws.  The Seller shall submit a draft of each Pre-Closing Tax Return to Buyer for review and comment at least thirty (30) days prior to the date on which such Pre-Closing Tax Return is to be filed. If Buyer disputes any item (or items) on such Pre-Closing Tax Return, Buyer shall notify the Seller Representative of such disputed item (or items) and the basis for its objection. Buyer shall prepare or cause to be prepared and timely file or cause to be filed all Tax Returns for the Acquired Company that include any Straddle Period (the "**Straddle Period Tax Returns**").  Each such Straddle Period Tax Return shall be prepared in a manner consistent with the prior practice of the Acquired Company except to the extent otherwise required by applicable Tax Laws.  At least thirty (30) days prior to the date on which each such Straddle Period Tax Return is to be filed, Buyer shall submit each such Tax Return to the Seller for review and comment.  If the Seller disputes any item (or items) on such Straddle Period Tax Return so submitted to the Seller, the Seller shall notify Buyer of such disputed item (or items) and the basis for such objection. When either the Seller or Buyer has timely objected to a Tax item in a Pre-Closing Tax Period or Straddle Period Tax Return as outlined above, the Seller and Buyer shall act in good faith to resolve any such dispute prior to the date on which the relevant Tax Return is required to be filed. If they cannot resolve any disputed item no later than ten (10) Business Days prior to the date the relevant Tax Return is required to be filed, then the item in question shall be submitted to and resolved by the Accounting Firm and the Accounting Firm shall be instructed to resolve such disputed item or items as soon as reasonably practicable.  The fees and expenses of the Accounting Firm shall be borne in the same proportion that the aggregate dollar amount of the disputed items submitted to the Accounting Firm that are unsuccessfully disputed by each such party bears to the total dollar amount of such disputed items so submitted (as determined by the Accounting Firm in its sole discretion); provided that, until such determination is made, the fees and disbursements of the Accounting Firm shall be borne equally by Buyer, on the one hand, and the Seller on the other, with the parties reimbursing each other, if necessary, following such determination. The Accounting Firm's determination shall be final, binding and conclusive as between the parties hereto.

(b)     In the case of Taxes that are payable with respect to any Straddle Period, the portion of any such Tax that is allocable to the portion of such Straddle Period ending on the Closing Date shall be:

(i)     In the case of Taxes that are either (A) based upon or related to income or receipts or payroll or (B) transaction based Taxes, including Taxes imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible), deemed equal to the amount which would be payable if the Taxable Period ending on the Closing Date, and the parties hereto shall elect to close the books on the Closing Date, if permitted by applicable Law; and

(ii)     In the case of Taxes imposed on a periodic basis with respect to the assets of the Acquired Company, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire Straddle Period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding Taxable Period), multiplied by a fraction the numerator of which is the number of days in the Straddle Period ending on the Closing Date and the denominator of which is the number of days in the entire Straddle Period.

(c)     In the case of any audit, assessment, adjustment, investigation or other proceeding for or relating to any Tax Return or liability in respect to Taxes ("**Tax Contest**") with respect to the Acquired Company for any Pre-Closing Tax Period, the Buyer shall promptly notify the Seller  of such matter and the Seller may, upon written notice to Buyer, assume and control the defense of such Tax Contest at its own cost and expense. If the Seller first receives notice of such a Tax Contest, Seller shall promptly notify the Buyer. If the Seller elects to assume the defense of any such Tax Contest, Buyer, at its own cost and expense, shall have the right to also participate in the defense of such Tax Contest.  The Seller shall keep Buyer informed of all material developments and events relating to such Tax Contest (including promptly forwarding copies to Buyer of any related correspondence or proposed settlements with any Tax Authority).  The Seller shall not consent to the entry of any judgment or enter into any settlement of any such Tax Contest without the prior written consent of Buyer, which shall not be unreasonably withheld, conditioned or delayed.  In connection with any: (i) Tax Contest that relates to any Straddle Period; (ii) Tax Contest for any Tax period beginning on or after the Closing Date; and (iii) Tax Contest that the Seller has the ability to control but does not timely elect to control pursuant to this Section, such Tax Contest shall be controlled by Buyer (and the Seller shall reimburse Buyer for reasonable out of pocket expenses incurred by Buyer relating to a Tax Contest described in clause (iii)), and the Seller agrees to cooperate in good faith with Buyer in pursuing such Tax Contest.  In the case of any Tax Contest with respect to the Acquired Company for any Straddle Period, Buyer shall keep the Seller informed of all material developments and events relating to such Tax Contest (including promptly forwarding copies to Buyer of any related correspondence or proposed settlements with any Governmental Authority). Buyer shall not consent to the entry of any judgment or enter into any settlement of any Tax Contest with respect to a Pre-Closing Tax Period or Straddle Period without the prior written consent of the Seller, which shall not be unreasonably withheld, conditioned, or delayed. In the event of any adjustment under Section 6225 of the Code with respect to a Pre-Closing Tax Period of the Acquired Company, the Seller shall cause there to be made an election under Section 6226 of the Code and will follow the procedures required in connection with such election, unless the Buyer gives prior written consent to refrain from making such election, which consent shall not be unreasonably withheld, conditioned or delayed.

(d)     Except to the extent that any refund or credit is attributable to the carryback of a Tax attribute attributable to a post-Closing Tax period, refunds (or credits in lieu of refunds) of any Taxes (including any interest thereon, and including over accrual of Taxes that are included in the computation of Working Capital for purposes of determining the Purchase Price) that are attributable to the Acquired Company relating to a Pre-Closing Tax Period or portion of the Straddle Period ending on the Closing Date, which are received by Buyer after the Closing Date, shall belong to the Seller and shall be promptly paid to the Seller when received.

(e)     After the Closing, the parties hereto shall cooperate with each other by furnishing any additional information and executing and delivering any additional documents as may be reasonably requested by such parties in their preparation of any Tax Returns required to be filed by or with respect to the Acquired Company. Such cooperation shall include access during normal business hours afforded to the parties hereto and their respective agents and representatives to, and reasonable retention by such parties of, Tax records related to the Acquired Company, and making employees and agents (including auditors) of the Acquired Company available on a reasonably convenient basis to provide additional information and explanation of any material provided hereunder.

(f)     All Transfer Taxes incurred in connection with the Contemplated Transactions shall be borne one-half by the Seller and one-half by Buyer.  The party required by Law to file a Tax Return with respect to such Transfer Taxes shall do so in the time and manner prescribed by Law, and the non-filing party shall promptly reimburse the filing party for its share of any Transfer Taxes upon receipt of evidence reasonably satisfactory to the non-filing party of the amount of such Transfer Taxes.

(g)       It is intended for U.S. federal income and all applicable state and local income Tax purposes that the Contemplated Transactions shall be treated, pursuant to Revenue Ruling 99-6, situation 2, as (i) with respect to the Seller, a taxable sale of the Acquired Interests pursuant to Sections 741 and 751 of the Code, and (ii) with respect to Buyer, a purchase of all the assets of the Acquired Company in consideration for an amount equal to the Purchase Price (including all amounts required to be treated as consideration for federal income Tax purposes) after such assets were distributed in liquidation of the Seller Parties' interests in the Acquired Company.  The parties hereto agree that, for all Tax purposes, the Contemplated Transactions will be reported in a manner that is consistent with the treatment described in this Section 8.1(g) and none of the (nor their respective Affiliates) will take any Tax position inconsistent therewith on any Tax Return or otherwise, except as otherwise required by a "**determination,**" within the meaning of Section 1313(a)(1) of the Code or any similar provision of any state, foreign or local Law.

(h)       The Seller and Buyer agree that the value of the Acquired Company's assets and allocation of the Purchase Price (including all amounts required to be treated as consideration for federal income Tax purposes) among such assets shall be allocated in the following manner: _____ will be allocated to the purchase of Windflower, with the balance allocated to the purchase of 625.  The Buyer shall file Form 8594 based on the foregoing allocation. Except as otherwise required by a Governmental Authority, no party shall take a position on any Tax Return or in any Tax proceeding inconsistent with the tax treatment described in Section 8.1(g) or the Allocation Schedule, as finalized.

**Section 8.2       Further Assurances**.  The parties shall execute and deliver all such other instruments and take all such other action as any party may reasonably request from time to time in order to effectuate the transactions provided for herein.  The parties shall cooperate with each other and with their respective counsel and accountants in connection with any steps to be taken as a part of their respective obligations under this Agreement.

**Section 8.3       Tail Insurance Policy**.  Seller shall pre-pay and bind, prior to closing, a tail insurance policy for Buyer, which will provide coverage for a period of at least two (2) years after the Closing Date, insuring Buyer against negligence, professional liability, and elder abuse related to the operation of the Facility from an insurance carrier approved by Buyer (the "**Tail Insurance Policy**").  After the Closing, Buyer shall exercise commercially reasonable efforts to maintain the Tail Insurance Policy in full force and effect.  Except with the written consent of the Seller, Buyer shall not amend, modify, or terminate the Tail Insurance Policy or any provision thereof in any manner that is adverse to the Seller.

**Section 8.4       Purchased Bank Accounts**.  Upon the Closing Date, Seller shall execute such documentation as may be required by the bank(s) holding all bank accounts of Windflower (including all accounts into which are deposited payments by Medicare or Medi-Cal, private or insurance company payments, payroll accounts, trust accounts, and any others) (the "**Purchased Bank Accounts**"), in order to add such person(s) designated by NAHS North as new signatories on the Purchased Bank Accounts.  During the sixty (60) day period immediately following the Closing Date, Seller shall remain a signatory on the Purchased Bank Accounts, including having access to such accounts; however, on the sixty first day after the Closing Date (i.e., the "**Transition Date**"), Seller shall no longer be a signatory on, nor have access to the Purchased Bank Accounts.  During the sixty-day period between the Closing Date and the Transition Date, Buyer shall handle all reconciliations of the Purchased Bank Accounts, including remitting to Seller such portion of the funds deposited therein as belong to Seller.  Buyer shall, no less than twice per month during the first 180 days following the Closing Date, and, thereafter, no less than once per month, remit to Seller such payments and revenues received in the Purchased Bank Accounts, which relate to Seller's operation of the Facility from before the Closing.  The applicable remittance advice accompanying such payment shall control whether a payment is related to the pre- or post-closing period, or, absent a remittance advice document, the parties will reasonably cooperate to allocate such payments.

**Article 9**
**General Provisions**

**Section 9.1     Expenses**.  Except as otherwise provided herein, the parties will pay all of their own expenses relating to the consummation of the Contemplated Transactions, including the fees and expenses of their respective counsel, brokers and financial advisers.  All fees and expenses of the Acquired Company in connection with the Contemplated Transactions (including any fees owed to any brokers retained by the Seller or the Acquired Company) are payable by Seller.

**Section 9.2     Brokers and Finders**.  Each Party hereto represents and warrants to the others that it has not employed or retained any broker or finder in connection with the Contemplated Transactions nor has it had any dealings with any Person which may entitle that Person to a fee or commission from any other party hereto.  Each of the Parties shall indemnify and hold the other harmless for, from and against any claim, demand or damages whatsoever by virtue of any arrangement or commitment made by it with or to any Person that may entitle such Person to any fee or commission from the other parties to this Agreement.  This provision shall survive the Closing.

**Section 9.3     Notices**.  All notices, requests, demands and other communications required or permitted under this Agreement shall be in writing and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, addressed as set forth below.  Any party may alter the address to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this paragraph for the giving of notice.

    (i)      If to the Seller:

            c/o California Opco, LLC, and Bay Bridge Capital Partners, LLC
            2701 Loker Avenue West, Suite 290
            Carlsbad, CA 92010
            Attn: Naveed Hakim

            with a copy (which shall not constitute notice) to:

            Sternshein Legal Group
            5316 East Chapman Avenue
            Orange, CA 92869
            Attention: Jennifer Sternshein
            Fax No: (714) 289-7071

    (ii)      If to Buyer:

            c/o NAHS North, Inc., a Nevada corporation
            25910 Acero Road, Suite 350
            Mission Viejo, CA  92691
            Attention: Spencer E. Olsen

            with a copy (which shall not constitute notice) to:

Albright, Stoddard, Warnick & Albright
Attention: William Stoddard
801 S. Rancho Drive, Suite D-4
Las Vegas, NV 89106
Fax No: (702) 384-0605

**Section 9.4** **Publicity and Confidentiality**. The Seller shall not issue any press release or make any other public statement relating to, connected with or arising out of this Agreement or the Contemplated Transactions, including the existence and terms of this Agreement. The Seller shall keep all non-public information disclosed pursuant to this Agreement confidential and will not disclose such information for any purpose or to any Person not related to the consummation and performance of this Agreement, other than to advisors and other representatives with a need to know; provided, however, that the provisions of this Section 9.4 will not prohibit (i) any disclosure required by any applicable Law, including any disclosure necessary or desirable to provide proper disclosure under securities Laws or under any rules or regulations of any securities exchange on which the securities of such party may be listed or traded (in which case the disclosing party will provide the other parties with the opportunity to review in advance the disclosure), (ii) any disclosure made in connection with the enforcement of any right or remedy relating to this Agreement, or (iii) disclosure of information which is in the public domain or which is otherwise known generally through no act or omission of the disclosing party or its representatives. Notwithstanding anything herein to the contrary, Buyer and its Affiliates shall not be prohibited from disclosure of their investment in the Acquired Company to their investors and prospective investors and Buyer and its Affiliates shall have the right to disclose information about the transactions set forth in this Agreement pursuant to their normal fundraising, marketing, information or reporting activities.

**Section 9.5** **Binding Nature of Agreement; Assignment**. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and assigns, except that no party may assign or transfer its or his rights or obligations under this Agreement without the prior written consent of the other parties hereto; provided, that Buyer may, without the consent of any other party, assign its rights, interests or obligations hereunder, in whole or in part, to any of its Affiliates, for collateral security purposes to any lender providing financing to Buyer or the Acquired Company or to any third party acquiror of Buyer or the Acquired Company. Except as set forth in Section 7.2 and Section 9.4, nothing in this Agreement is intended to confer any rights or benefits to any third party.

**Section 9.6** **Entire Agreement; Amendment**. This Agreement and the other documents required to be delivered by the Parties at the Closing, together with the exhibits and schedules hereto and thereto, contain the entire agreement and understanding among the parties with respect to the subject matter hereof and thereof, and supersede all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by Buyer and the Seller.

**Section 9.7** **Controlling Law**. This Agreement and all questions relating to its validity, interpretation, performance and enforcement, shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of California, notwithstanding any conflict-of-law provisions to the contrary.

**Section 9.8** **Arbitration**. Except for claims of equitable relief and as otherwise expressly otherwise provided herein, all disputes arising out of, in connection with or related to this Agreement shall be settled exclusively by confidential, binding arbitration in accordance with this Section 9.8; provided, however, that this Section 9.8 shall not preclude any Party from seeking equitable relief in a

court of competent jurisdiction. Arbitration shall be held in the Venue under the auspices of the American Arbitration Association (the "**AAA**") pursuant to the Commercial Arbitration Rules of the AAA, and shall be by one arbitrator, independent of the Parties, selected by mutual agreement of the Parties from a list provided by the AAA in accordance with such Commercial Arbitration Rules; <u>provided</u>, that if the Parties are unable to agree on an arbitrator within thirty (30) days after receiving the AAA's proposed list of arbitrators, then each Party shall select an arbitrator from such list and such arbitrators shall together select a third arbitrator to act as the arbitrator; <u>provided</u>, <u>further</u>, that if any Party does not select an arbitrator within ten (10) days of written demand therefor by the other Party, then the arbitrator selected by the other Party shall act as the arbitrator. The arbitrator shall make his or her decision in writing within thirty (30) days after the close of the arbitration hearing. To the maximum extent permitted by Law, the decision of the arbitrator shall be final and binding and not be subject to appeal. If a Party against whom the arbitrator renders an award fails to abide by such award, the other Party or Parties may seek to enforce such award in a court of competent jurisdiction. The Parties shall allow and participate in discovery in accordance with the United States Federal Rules of Civil Procedure and unresolved discovery disputes shall be submitted to the arbitrator.

Section 9.9    <u>Jurisdiction</u>. The Parties hereby agree that if arbitration is unavailable (other than with respect to a matter that this Agreement expressly provides is not to be settled by arbitration pursuant to <u>Section 9.8</u>) or if equitable relief is being sought outside of arbitration, then any action, suit or other proceeding arising out of or in connection with or related to this Agreement shall be conducted only in the Venue. Without limiting the requirement to arbitrate disputes as set forth herein, each Party hereby irrevocably consents and submits to the exclusive personal jurisdiction of and venue in the state and federal courts located in the Venue in any legal action, equitable suit or other proceeding arising out of or related to this Agreement. Each Party hereby waives any right it may have to assert the doctrine of *forum non conveniens* or similar doctrine or to object to venue with respect to any proceeding brought in accordance with this <u>Section 9.9</u>, and stipulates that the state and federal courts located in the Venue shall have *in personam* jurisdiction and venue over each of them for the purposes of litigating any dispute, controversy or proceeding arising out of or related to this Agreement.

Section 9.10    <u>WAIVER OF JURY TRIAL</u>. THE SELLER, THE ACQUIRED COMPANY AND BUYER KNOWINGLY, VOLUNTARILY, IRREVOCABLY, UNCONDITIONALLY AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, OR ANY CONTRACT, OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON OR PARTY AND RELATED TO THIS AGREEMENT OR ANY CONTRACT; THIS IRREVOCABLE WAIVER OF THE RIGHT TO A JURY TRIAL BEING A MATERIAL INDUCEMENT FOR THE SELLER, THE ACQUIRED COMPANY AND BUYER TO ENTER INTO THIS AGREEMENT.

Section 9.11    <u>Remedies Cumulative</u>. The remedies of the parties under this Agreement are cumulative and shall not exclude any other remedies to which any party may be lawfully entitled.

Section 9.12    <u>Schedules and Exhibits</u>. Subject to <u>Section 9.21</u>, all Schedules, Disclosure Schedules and Exhibits referred to herein or attached hereto are hereby incorporated by reference into, and made a part of, this Agreement.

Section 9.13    <u>No Partnership</u>. Nothing in this Agreement will be deemed to create a joint venture or partnership between the parties.

Section 9.14    <u>Indulgences, Not Waivers</u>. Neither the failure nor any delay on the part

of a party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence.  No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

   **Section 9.15**  __Execution__.  This Agreement may be executed in counterparts, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument.  This Agreement shall become binding when one or more counterparts hereof or thereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon or thereon, respectively, as the signatories.  The facsimile, pdf or email transmission of a signed signature page, by any party to the other(s), shall constitute valid execution and acceptance of this Agreement by the signing/transmitting party.

   **Section 9.16**  __Provisions Separable__.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction will, as to that jurisdiction, be ineffective to the extent of the prohibition or unenforceability without invalidating the remaining provisions of this Agreement and any prohibition or unenforceability in any jurisdiction will not invalidate or render unenforceable the provision in any other jurisdiction.  To the maximum extent permitted by applicable Law, the parties to this Agreement waive any provision of Law that renders any provision of this Agreement prohibited or unenforceable in any respect.

   **Section 9.17**  __Company Assets__.  If the Seller or any of their respective Affiliates owns or shall at any time hereafter acquire any rights in any of the Acquired Company's assets, the Seller or Affiliate thereof shall transfer all of their rights, title and interest in such assets to the Acquired Company for no additional consideration, and shall execute and deliver such additional documents and instruments and take such other actions as the Acquired Company or Buyer shall reasonably request to give effect to the provisions of this __Section 9.17__.

   **Section 9.18**  __Construction__.  The parties hereto acknowledge that each party was represented by legal counsel (or had the opportunity to be represented by legal counsel) in connection with this Agreement and that each of them and his or its counsel has reviewed and revised this Agreement, or has had an opportunity to do so, and that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any amendments or any exhibits or schedules hereto or thereto.  The parties intend that each representation, warranty and covenant contained herein will be taken together as a whole.  If any party has breached or violated, or if there is an inaccuracy in, any representation, warranty or covenant contained herein in any respect, the fact that there exists another representation, warranty or covenant relating to the same subject matter (regardless of the relative levels of specificity) which the party has not breached or violated, or in respect of which there is not an inaccuracy, will be read together as a whole.  Unless otherwise stated, accounting terms used and not expressly defined herein shall have the meanings given to them under GAAP.

   **Section 9.19**  __Introduction__.  By this reference the introduction to this Agreement is incorporated herein and made a part of this Agreement.

   **Section 9.20**  __Headings__.  The Section headings contained in this Agreement are inserted for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

   **Section 9.21**  __Schedules; Listed Documents; etc__.  Neither the listing nor description of

any item, matter or document in any Schedule or Disclosure Schedule hereto or the furnishing or availability for review of any document will be construed to modify, qualify or disclose an exception to any representation or warranty of any party made herein or in connection herewith, except to the extent that such representation or warranty specifically refers to such Schedule or Disclosure Schedule (including reference to the particular section and/or subsection of this Agreement to which such disclosure relates) and such modification, qualification or exception is clearly described in such Schedule or Disclosure Schedule.

      **Section 9.22**   **Survival**. Any provision of this Agreement that contemplates performance or the existence of obligations after the Closing Date, and any and all representations and warranties set forth in this Agreement, shall not be deemed to be merged into or waived by the execution and delivery of the instruments executed at the Closing, but shall expressly survive the Closing for a period of two (2) years and shall be binding upon the party or parties obligated thereby in accordance with the terms of this Agreement.

**[Signature page follows]**

**IN WITNESS WHEREOF**, the Parties have executed or caused to be executed by a duly authorized representative and delivered this Agreement as of the date first above written.

<u>**SELLER**</u>:

**CALIFORNIA OPCO, LLC,**
a California limited liability company,

By: _____
Name: _____
Its: _____

**BAY BRIDGE CAPITAL PARTNERS, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Its: _____

<u>**ACQUIRED COMPANY**</u>:

**625 16th STREET, LLC**,
a California limited liability company

By: _____
Name: _____
Its: _____

**WINDFLOWER HOLDINGS, LLC**,
a California limited liability company

By: _____
Name: _____
Its: _____

<u>**BUYER**</u>:

**NAHS NORTH, INC.**, a Nevada corporation

By: _____

Name: _____

Its: _____


**SENSEN LLC**, a Nevada limited liability
company


By: _____

    Spencer E. Olsen, Manager

<u>**INDEX OF SCHEDULES AND EXHIBITS**</u>
<u>**TO**</u>
<u>**MEMBERSHIP INTEREST AND PURCHASE AND SALE AGREEMENT**</u>

**SCHEDULES**

| | |
|---|---|
| Schedule 2.5(a) | Assumed Quality Assurance Fees |
| Schedule 2.5(b) | Assumed Medicare Advanced Payments |
| Schedule 2.06(b) | Excluded Assets |
| Schedule 3.2(a)(ii) | Certificate of Good Standing |
| Schedule 3.2(a)(viii) | Bill of Sale |
| Schedule 3.2(a)(xii) | Form of OTA |
| Schedule 4.1(b) | Directors, Managers, Officers |
| Schedule 4.3 | Consents |
| Schedule 4.4 | Balance Sheet |
| Schedule 4.6 | Business Names |
| Schedule 4.8 | Contracts |
| Schedule 4.9 | Intellectual Property |
| Schedule 4.10 | Litigation |
| Schedule 4.11 | Tax |
| Schedule 4.12 | Legal Compliance |
| Schedule 4.16 | Census |
| Schedule 4.18 | Employee Benefit Plan |
| Schedule 4.19 | Environmental Matters |
| Schedule 4.20 | Stimulus Funds |
| Schedule 4.22 | Insurance |

SCHEDULE 2.5(a)

"Assumed Quality Assurance Fees"

None.

SCHEDULE 2.5(b)

"Assumed Medicare Advanced Payments"

As of July 6, 2021, _____ has been recouped, leaving _____ outstanding.

Balance as of the Closing Date will be updated.

SCHEDULE 2.6(b);

"Excluded Assets"

The equipment provided under that certain Master Subscription Agreement dated May 23, 2018, by and between Plum Healthcare Group, LLC, and Lenovo Financial Services.

SCHEDULE 3.2(a)(ii)

"Certificate of Good Standing"

[To be attached]

Schedule 3.2(a)(viii)

**FORM OF BILL OF SALE**

**BILL OF SALE**

THIS BILL OF SALE ("**Bill of Sale**") is made as of _____ ___, 2021, by California Opco, LLC, a California limited liability company ("**Cal**"), Bay Bridge Capital Partners, LLC, a Delaware limited liability company ("**Bay Bridge**"; and collectively with Cal, the "**Seller**"), 625 16th Street, LLC, a California limited liability company ("**625**"), and Windflower Holdings, LLC, a California limited liability company ("**Windflower**"; and collectively with 625, the "**Acquired Company**") in favor of Sensen LLC, a Nevada limited liability company ("**Sensen**"), and NAHS North, Inc., a Nevada corporation ("**NAHS**"; and collectively with Sensen, the "**Purchaser**").

**RECITALS:**

**A.** Pursuant to a certain Membership Interest Purchase and Sale Agreement (the "Purchase Agreement") dated as of even date herewith, by and among Seller, Acquired Company, and Purchasers, Seller and Acquired Company have agreed to sell, transfer, convey, assign and deliver certain assets to Purchaser with respect to that certain skilled nursing facility commonly known as "Rocky Point Care Center" and located at 625 16th Street, Lakeport, CA 95453 (the "**Facility**").

**B.** Seller, Acquired Company, and Purchaser desire to enter into this Bill of Sale in accordance with the provisions of the Purchase Agreement in order to provide for the transfer and assignment by Seller and Acquired Company to Purchaser of all rights, title, and interests of Seller and Acquired Company in and to the Acquired Assets.

**AGREEMENT:**

NOW, THEREFORE, for good and valuable consideration, the receipt of which is hereby acknowledged:

**1.** Defined Terms**.** Words whose initial letters are capitalized are defined terms. Unless otherwise defined in this Bill of Sale, such terms shall have the same meaning as that ascribed to them in the Purchase Agreement.

**2.** Transferred Assets.

*2.1* **Acquired Assets**. Effective as of 12:00:01 a.m., Eastern Time, on the date of this Bill of Sale, Seller and Purchaser hereby sell, transfer, convey, assign, set over and confirm unto the Purchaser and respective successors and assigns, to have and to hold, for its own use forever free and clear of all liens, pledges, charges and encumbrances of any nature whatsoever, all of Seller and Acquired Company's respective rights, title and interest under, in and to the following assets with respect to the Facility (collectively, the "Acquired Assets"):

*(a)* All of Seller's and Acquired Company's right, title and interest in and to all tangible personal property and interests therein, including all machinery, equipment,

computer systems, furniture, furnishings and vehicles, together with all repairs thereto and replacements thereof, and warranties relating thereto, located at the Facility and/or used in connection with the conduct of business at the Facility.

    *(b)*  All rights, claims and credits to the extent relating to the Acquired Assets or any Assumed Liabilities, including any such items arising under insurance policies (including all insurance proceeds arising from any casualty, including all business interruption insurance) and all guarantees, warranties, indemnities and similar rights in favor of Seller or Acquired Company in respect of the Acquired Assets or any Assumed Liabilities.

    *(c)*  All investments (other than investments that are Excluded Assets) owned by Seller and Acquired Company on the date of the Purchase Agreement that are used, held for use or intended to be used primarily in, or arise primarily out of, the operation or conduct of business at the Facility.

  **3.**  <u>Representations.</u> The Seller and Acquired Company hereby covenant to and with the Purchaser that:

    *(a)*  the Acquired Assets are free from all claims, liens and encumbrances;

    *(b)*  the Seller and Acquired Company have good right and title to sell and transfer the Acquired Assets;

    *(c)*  the Seller and Acquired Company will warrant and defend the Acquired Assets against all lawful claims and demands whatsoever alleged to have arisen prior to the date of this Bill of Sale.

  **4.**  <u>Further Assurances</u>**.** Seller and Acquired Company hereby covenant and agree that they will from time to time, at the request of Purchaser and without further consideration, take such additional actions and duly execute and deliver to Purchaser and its successors such additional instruments and documents, as may be reasonably required in order to assign, transfer, vest title to any of the Acquired Assets in or to Purchaser and its successors and assigns.

  **5.**  <u>Benefit</u>**.** This Bill of Sale shall inure to Purchaser and its affiliates, and their successors and assigns, and shall be binding upon Purchaser and its affiliates and their successors and assigns.

  **6.**  <u>No Modification to Purchase Agreement</u>**.** This Bill of Sale is delivered pursuant to the Purchase Agreement and is subject in all respects to the provisions of the Purchase Agreement and is not meant to alter, enlarge, limit, or otherwise modify the provisions of the Purchase Agreement.

**SIGNATURES APPEAR ON THE FOLLOWING PAGE**

**IN WITNESS WHEREOF,** the undersigned have caused this Bill of Sale to be executed on their behalf, as of the date first written above.

<u>**SELLER**</u>:

**CALIFORNIA OPCO, LLC,**
a California limited liability company,

By: _____
Name: _____
Its: _____

**BAY BRIDGE CAPITAL PARTNERS, LLC**,
a Delaware limited liability company

By: _____
Name: _____
Its: _____

<u>**ACQUIRED COMPANY**</u>:

**625 16th STREET, LLC**,
a California limited liability company

By: _____
Name: _____
Its: _____

**WINDFLOWER HOLDINGS, LLC**,
a California limited liability company

By: _____
Name: _____
Its: _____

SCHEDULE 3.2(b)(ii)

"Form of OTA"

**OPERATIONS TRANSFER AND TRANSITION SERVICES AGREEMENT**

  This Operations Transfer and Transition Services Agreement together with all exhibits, schedules and documents required herein (the "**OTA**"), dated as of _____, 2021, is by and between California Opco, LLC, a California limited liability company (sometimes hereinafter the "**Transferor**"), and NAHS North Inc., a Nevada corporation (the "**Transferee**") (Transferor and Transferee are referred to as a "**Party**" and collectively as the "**Parties**").  Capitalized terms not defined herein shall have the meanings assigned to them in that certain Membership Interest Purchase and Sale Agreement (the "**MIPA**") dated as of even date herewith by and between Sensen LLC, a Nevada limited liability company and Transferee (collectively as the "**Buyer**" thereunder), on the one hand, and Windflower Holdings, LLC, a California limited liability company, 625 16th Street, LLC, a California limited liability company, Bay Bridge Capital Partners, LLC, a Delaware limited liability company, and Transferor (collectively as the "**Seller**" thereunder), on the other hand.

**RECITALS**

  **WHEREAS**, Windflower Holdings, LLC, a California limited liability company (hereinafter "**Windflower**"), currently operates that certain skilled nursing home facility commonly known as "Rocky Point Care Center", located at 625 16th Street, Lakeport, CA 95453 (the "**Facility**"), and all of the furniture, fixtures and equipment and other items of personal property located therein;

  **WHEREAS**, Transferor is the owner of all (100%) of the membership interests of Windflower, which is the licensed operator of the Facility;

  **WHEREAS**, Transferor desires to divest itself of membership interests of Windflower (the operator of the Facility), and Transferee desires to acquire from Transferor all of the membership interests of Windflower, including all of its interest in certain tangible and intangible property and other interests relating to the operation and/or management of the Facility, all upon the terms and conditions contained in the MIPA and this OTA;

  **WHEREAS**, the Parties hereto desire for Windflower to continue operating the Facility, and for Transferor to transfer its interest in that entity to Transferee on the Closing Date, such that Transferee shall appoint new managers to direct the operations and business of Windflower (including the Facility) on the Closing Date; and,

  **WHEREAS**, in order to facilitate a transition of the operational and financial responsibility with regard to Windflower and the Facility from Transferor to Transferee in a manner which will ensure the continued operation of the Facility after the Closing Date in compliance with applicable law and in a manner which does not jeopardize the health and welfare of the residents of the Facility, the Parties wish to document the agreement reached with certain terms and conditions relevant to the lawful and orderly transition of certain operational and financial responsibility for the Facility from Transferor to Transferee.

  **NOW, THEREFORE**, in consideration of the premises, the mutual obligations of the Parties contained in this OTA, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE I:  CHANGE OF OWNERSHIP, BILLINGS AND COLLECTIONS

1.1     <u>Change of Ownership of Windflower</u>.  Upon receipt of a fully executed copy of this Agreement, Transferee shall promptly file (or cause Windflower to file) all change of ownership applications and other documents required to update the ownership of all (100%) of the membership interests of Windflower by Transferee.

1.2     <u>Termination</u>.  Unless sooner terminated by either party, this Agreement shall terminate by its terms at the end of the Temporary Licensing Period.

1.3     <u>Billings, Collections and Accounts Receivable</u>.

(a)     During the Temporary Licensing Period, Transferor authorizes Transferee to do the following:

(i)     To cause Windflower to bill patients under Windflower's Provider Numbers;

(ii)     To cause Windflower to collect accounts receivable resulting from such billings, including to cause Windflower to receive payments from Government Entities, insurance companies, prepayments from health care plans, and payments from all other third-party payors; and

(iii)     To cause Windflower to remit funds received by Windflower on and after the Closing Date, which are related to services rendered by Transferor prior to the Closing Date to Transferor (all such reconciliations being handled pursuant to the terms of the MIPA).

1.4     <u>Patient Records</u>. During the Temporary Licensing Period, Transferor authorizes Transferee to cause Windflower to continue to retain and maintain all patient records, charts and related documentation, in the ordinary course of business, consistent with past practice and applicable Laws.

## ARTICLE II:  CLOSING

2.1     <u>Time and Place of Closing</u>.  The closing of the transactions ("**Closing**") contemplated under this OTA will take place on the "Closing Date" as that date is defined under the MIPA.

## ARTICLE III:  RESIDENT TRUST FUND AND PURCHASED BANK ACCOUNTS

3.1     <u>Resident Trust Fund</u>.  Following the Closing Date, Windflower shall maintain all resident trust funds.  In that regard, on the Closing Date, Transferor shall transfer to such personnel of Windflower as are appointed by Transferee the signature authority for such resident trust funds, so that Windflower can ensure that such funds are handled in compliance with all applicable Laws, governmental statutes, rules and regulations.

3.2     <u>Bank Accounts</u>.  Transferor shall transfer the signature authority on the Purchased Bank Accounts pursuant to the terms of the MIPA.

## ARTICLE IV: TERMINATION

4.1     <u>Termination</u>.  This OTA may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing by written consent of Transferor and Transferee.

## ARTICLE V:   ASSIGNMENT

5.1     <u>Assignment</u>.  This OTA is not assignable without the consent of the Parties.

## ARTICLE VI:   MISCELLANEOUS

6.1     <u>Payment of Expenses</u>.  Whether or not the transactions contemplated by this OTA are consummated, each Party shall pay its own expenses incident to preparing for, entering into and carrying out this OTA and the transactions contemplated hereby.

6.2     <u>Entire Agreement; Assignment</u>.   This OTA constitutes the entire agreement, and supersedes all other agreements, understandings, representations and warranties, written, oral, electronic, or otherwise, between the Parties with respect to the subject matter hereof, and is not intended to create any obligations to, or rights in respect of, any persons and entities other than the Parties.

6.3     <u>Modification or Amendment</u>.  The Parties may modify or amend this OTA at any time, only by a written instrument duly executed and delivered by each Party.

6.4     <u>Notices</u>.  All notices and other communications given or made pursuant hereto shall be in accordance with the MIPA.

6.5     <u>Governing Law; Consent to Jurisdiction</u>.  This OTA shall be governed by and construed in accordance with the Laws of the State of California, without regard to the conflicts of laws principles thereof.  Each of the Parties (a) consents to submit itself to the personal jurisdiction of any federal court located in the State of California or any California state court in the event any dispute arises out of this OTA or any of the transactions contemplated by this OTA; and (b) agrees that it will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court.  Each of the Parties further irrevocably unconditionally waives and agrees not to plead or claim any such action or proceeding brought in any such court has been brought in an inconvenient forum.

6.6     <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this OTA, time is of the essence.

6.7     <u>Counterparts</u>.  This OTA may be executed in the original, by facsimile, or by way of PDF in any number of counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

6.8     <u>Definitions</u>.  In addition to the terms otherwise defined herein, the following terms shall have the following meaning:

"**Facility**" shall have the meaning set forth in the Background Section of this OTA.

"**Governmental Authority**" or "**Governmental Entity**" shall mean any Federal, state, local or foreign government or any court of competent jurisdiction, administrative agency or commission or other governmental or quasi-governmental authority or instrumentality, domestic or foreign.

"**Law**" shall mean any statute, law, rule or regulation or ordinance of any Governmental Authority.

"**Person**" shall mean any individual, limited partnership, limited liability company, trust or any other entity whatsoever.

"**Provider Numbers**" shall mean the National Provider Identifier and any other identifying numbers which Windflower may use to bill for services provided to patients (of any payor source) at the Facility.

"**Temporary Licensing Period**" shall mean the period commencing on the Closing Date and ending on the date Windflower is issued a permanent license to operate the Facility under the ownership of Transferee.

[*Signature Page to Follow*]

**IN WITNESS WHEREOF**, each of the Parties hereto and in the capacity indicated below has executed this OTA as of the day and year first above written.

**TRANSFEROR**:

California Opco, LLC,
a California limited liability company


By: _____

Name:_____

Its: _____


**TRANSFEREE**:

NAHS North Inc.,
a Nevada corporation


By: _____

Name:_____

Its: _____

SCHEDULE 4.1(b)

"Directors, Managers, and Officers"

1.  Windflower Managers:

Mark Beckel, Naveed Hakim


2.  625 Managers:

Mark Beckel, Naveed Hakim

SCHEDULE 4.3

"Consents"

1.  Within ten (10) days after the Closing, submission of the Change of Indirect Ownership packet to the California Department of Public Health, Licensing and Certification Program.

2.  Submission of a Change of Information notice to Medicare.

SCHEDULE 4.4

"Balance Sheet"

[Attached]

SCHEDULE 4.6

"Business Names"

[Attached]

SCHEDULE 4.8

"Contracts"

1. Service Agreement, dated as of August 1, 2012, by and between Windflower Holdings, LLC dba Rocky Point Care Center and Consonus Pharmacy Services CA North, LLC

2. Nurses and Professional Healthcare Temporary Staffing Agreement, dated as of April 1, 2019, between Nurses and Professional Healthcare and Rocky Point Care Center

3. Health Insurance Benefit Agreement, dated as of March 17, 2011, by and between Windflower Holdings, LLC dba Rocky Point Care Center and the Secretary of Health and Human Services.

4. Health Insurance Benefit Agreement, dated as of March 17, 2011, by and between Windflower Holdings, LLC dba Rocky Point Care Center and the Secretary of Health and Human Services.

SCHEDULE 4.9

"Intellectual Property"

1. Domain Name Registration:   rockypointcarecenter.com

SCHEDULE 4.10

"Litigation"

[To be completed]

SCHEDULE 4.11

"Tax"

None

SCHEDULE 4.12

"Legal Compliance"

None.

SCHEDULE 4.16

"Acquired Company Employees"

As of the Closing Date, all employees, except for the nursing home administrator and the director of nursing, shall be retained pursuant to Health and Safety Code Section 1267.62

SCHEDULE  4.18(a)

"Employee Benefit Plan"

1. Medical: Gold, Silver, Bronze, Mini-Medical, and Combined Mini-Medical Bronze self-insured plan options administered by Anthem Blue Cross; Gold, Silver and Bronze plan options insured by Kaiser

2. Vision Insurance through VSP

3. Dental Insurance through Delta Dental of California

4. Plum Healthcare Group 401(k) Plan

SCHEDULE 4.19

"Environmental Matters"

None, except as may be disclosed in that certain Phase 1 Report dated July 1, 2016, Project No. 16-165106.94

All reports, investigations, sample reports, and similar information in the possession or control of Seller with respect to any environmental subject matter that relates to the Business Premises have been provided to Buyer pursuant to the following data room link: https://phg.securedocs.com/folders/60df7d72fab76fb49e488178

SCHEDULE 4.20

"Stimulus Funds"

[To be completed]

SCHEDULE  4.22

[To be completed]